In the

# United States Court of Appeals

## For the Seventh Circuit

———————

Nos. 04-1594, 04-1595, 04-1763, 04-1999 & 05-2668

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

DARYL L. WILSON, STEVIE THOMAS,
DONNELL L. COHN, SAMMY ARMSTEAD,
and TYREE COLLINS,

*Defendants-Appellants*.

———————

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 CR 895—**Rebecca R. Pallmeyer**, *Judge.*

———————

ARGUED FEBRUARY 6, 2007—DECIDED MARCH 16, 2007

———————

Before KANNE, WOOD, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* This multi-defendant criminal appeal concerns a drug conspiracy at a public housing complex in Chicago. The five defendants were members of the Gangster Disciples ("GD") street gang, which organized all drug sales at a building at 340 South Western Avenue. Each was indicted for, among other things, conspiracy to possess with intent to deliver crack cocaine within 1000 feet of a public housing complex. Donnell Cohn and Tyree Collins pled guilty while Sammy Armstead, Darryl Wilson, and Stevie Thomas went to trial and were

found guilty. Their sentences range from 180 months to life imprisonment.

The principal argument on appeal is that the government failed to disclose material evidence that could have allowed the defendants who went to trial to impeach one of the prosecution's key witnesses. In light of the overwhelming evidence against the defendants, we find that the suppressed evidence was not material. Several defendants also raise various sentencing issues. In accordance with the procedure set forth in *United States v. Paladino*, 401 F.3d 471 (7th Cir. 2005), we order a limited remand as to the sentences of Armstead and Wilson. We dismiss Cohn's appeal because his plea agreement contained a waiver of his appeal rights. Finally, Collins's appointed counsel moves to withdraw under *Anders v. California*, 386 U.S. 738 (1967). Because we agree with counsel that any potential appellate issue would be frivolous, we grant the motion to withdraw and dismiss Collins's appeal.

## I. BACKGROUND

In 2000 the Department of Housing and Urban Development ("HUD") began investigating drug sales at the 340 building, which was a part of the Rockwell Gardens public housing complex on the west side of Chicago. Through the use of undercover agents, cooperating co-defendants, and audio- and video-recordings of gang meetings and conversations, HUD brought to light a substantial business in crack cocaine from 1999 to 2002 that was spearheaded and organized by the GDs. Over a nine-month period, two undercover agents purchased almost 200 grams of crack in approximately 50 separate transactions, including from defendants Wilson and Thomas. Investigators also secured the cooperation of a number of members of the conspiracy, including Richard Epps (a former high-ranking GD member who was de-

moted for conducting a side-business in drugs), and Derquann Butts and Trevon Banks (two disgruntled GD members who were beaten for insubordination). In addition, defendant Collins cooperated with the government and was rewarded with the promise of a sentence of one-half the bottom end of his range under the Sentencing Guidelines. Collins eventually pled guilty and was sentenced to 180 months' imprisonment; on appeal he challenges his sentence.

The evidence against the other defendants was substantial. According to audio recordings and testimony from co-defendants, defendant Armstead was the governor of the GDs for the west side of Chicago beginning in September 2001—he controlled all west side operations for the gang. The government introduced a recording, obtained through a wire transmitter worn by one of the cooperating co-defendants, of an October 2001 gang meeting that Armstead led. The meeting was an attempt to kick-start the GD drug business at the 340 building, which was disorganized and inefficient. The standing policy was for gang members to sell the gang's drugs on the first four days of the month—when residents of the building received paychecks or public assistance—leaving the remainder of the month for sales from gang members' private stashes. Some gang members were tired of the policy and asked Armstead to propose to his superiors cutting back gang sales to every other month. He promised to relay the concern, but otherwise emphasized the need for cooperation and reinforced the first-of-the-month policy, which he said would benefit all gang members. The government also made audio and video recordings of meetings in August and September 2002, in which Armstead described the GDs' sales organization at the 340 building, brainstormed new ways to increase profits through drug sales, and encouraged defendant Collins (who by that time was cooperating with the government)

to take a leadership role in the gang's operations at the 340 building. Finally, the government introduced recordings of several telephone calls in which Armstead demonstrated his control over the conspiracy. The recordings were corroborated by the testimony of cooperating co-defendants Epps and Collins. In addition, cooperating co-defendants Banks and Butts confirmed that Armstead was the governor of the west side GD organization. Armstead was found guilty of conspiracy and using a telephone to commit a felony. He was sentenced to life imprisonment. On appeal he challenges both his conviction and his sentence.

The government's case against defendant Wilson was based largely on the testimony of the two undercover HUD agents. Wilson was a regent of the GDs for the 340 building (regents control all gang activity at a particular location). On at least four occasions, he sold crack to an undercover agent, and usually did so in cooperation with other gang members, whom he either directed to obtain crack for him to sell or instructed to sell crack to the agent on his behalf. The agent had to be searched by other gang members before he could enter the 340 building. Cooperating co-defendants Banks and Butts also testified that as regent, Wilson collected proceeds from the sale of gang drugs and helped enforce gang policies. Wilson pled guilty to four counts of individual crack sales but went to trial on the conspiracy charge. He was found guilty and sentenced to life imprisonment. He appeals his conviction and sentence.

Defendant Thomas did not have a leadership role in the organization; he merely sold crack on behalf of the gang. On one occasion he sold crack directly to a HUD agent, instructing another gang member to obtain an additional amount of drugs to complete the order. On another occasion, Thomas attempted to intervene while other GDs at the 340 building sold crack to the agent. When told to

provide security on the deal by standing on the lookout for police officers, Thomas complained because he would not earn any money in that capacity. He went to trial charged with conspiracy and several individual drug sales; he was convicted and sentenced to 240 months' imprisonment. He appeals only his conviction.

Lastly, defendant Cohn pled guilty to conspiracy to sell drugs near a public housing facility and was sentenced to 300 months' imprisonment. He appeals only his sentence.

## II.  ANALYSIS

### A.  *Brady* claim raised by Armstead, Wilson, and Thomas

The three defendants who went to trial challenge the district court's denial of their motion for a new trial on the basis of suppressed evidence. During discovery, the government produced hundreds of pages of notes and correspondence from Richard Epps, the former GD leader who cooperated with prosecutors. But two weeks after trial it emerged that the government inadvertently left out two letters that Epps had sent from prison to a fellow prisoner and GD member.[1] The three pages of handwritten materials contain rationalizations for Epps's decision to cooperate, advice to his correspondent, and obscene drawings. One of the letters also states:

> Now if I see it [illegible] im going to cop out and save myself. But im first going to try and get them on "tee" [illegible] [illegible] mistake. But if not im going to get Sundown BroLock and Lil-C[.] I don't

---

[1] The defendants do not contend that the government intentionally withheld the letters.

want to fuck no one I grew up with and that on my Mom, Wife and my Child. . . . I tried to free a lot of guys but they had already made Statement. if they would had remain quiet they would be free. I got Aaron off this case and prove to them we never had on dealing.

The defendants argue that in this passage, "Epps basically claims that he had been and would continue to shape the prosecution to protect his friends and family and punish his enemies through lying and perjury." They contend that they could have used the letters to impeach Epps by showing that he was willing to use his role as cooperating co-defendant to settle old scores. In this regard they note that Epps had a motive to attack Armstead and Wilson: Armstead demoted Epps from his high-level position, and Wilson's complaint led to the demotion. The government responds that any impeachment value would have been cumulative of other impeachment at trial, where Epps was thoroughly dressed down before the jury as a liar, a braggart, and a thug. But the government concedes that no impeachment at trial tended to show that Epps was biased against some of his co-defendants or that he was willing to lie or provide selective testimony to punish his enemies.

If the government deliberately or inadvertently withholds evidence that is material and favorable to the defense, it violates the defendant's right to a fair trial, which is guaranteed by due process. *See Brady v. Maryland*, 373 U.S. 83 (1963); *Boss v. Pierce*, 263 F.3d 734, 739-40 (7th Cir. 2001). This rule applies equally to impeachment and exculpatory evidence. *Giglio v. United States*, 405 U.S. 150 (1972). The government does not dispute that it withheld Epps's letters, and its efforts to show that the letters are not favorable to the defendants are unpersuasive. Epps said he tried to "get" certain gang members (one of whom, Sundown, was a GD board member who autho-

rized Epps's demotion) and boasted that he "got Aaron off." While the evidence would be even more damning if Epps had said that he wanted to "get" these particular defendants, it is undisputed that he had reason to go after Wilson and Armstead. Evidence that a witness is willing to use his role in a prosecution to target his enemies is certainly favorable to defendants who are his enemies.

The claim therefore turns on materiality, which in the *Brady* context is the same thing as prejudice. Evidence is material if there is a reasonable probability that its proper disclosure would have led to a different result at trial. *See Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995). In other words, the inquiry is whether, in light of the suppression, the trial produced a verdict worthy of confidence. *Id.*; *United States v. Knight*, 342 F.3d 697, 705 (7th Cir. 2003). Suppressed evidence that could have been used to impeach a government witness can affect the outcome if it is not cumulative of other impeachment offered at trial. *See Simental v. Matrisciano*, 363 F.3d 607, 614 (7th Cir. 2004); *United States v. Fallon*, 348 F.3d 248, 252 (7th Cir. 2003). Thus, evidence that provides a new basis for impeachment is not cumulative and could well be material. *See Banks v. Dretke*, 540 U.S. 668, 700-02 (2004); *see also Napue v. Illinois*, 360 U.S. 264, 270 (1959). For instance, in the Supreme Court's recent decision in *Banks v. Dretke*, prosecutors withheld that one of their key witnesses had been paid as a police informant for his participation in the prosecution. The witness was impeached at trial for having been a paid informant in the past, and for having been a drug abuser. The Court held that the suppressed evidence was not cumulative of other impeachment: "Neither witness called to impeach Farr gave evidence directly relevant to Farr's part in Banks's trial." 540 U.S. at 702. Since Farr's testimony was critical to the prosecution, the evidence was material and its suppression deprived the defendant of due process. *See*

*also Silva v. Brown*, 416 F.3d 980, 988-89 (9th Cir. 2005); *Conley v. United States*, 415 F.3d 183, 191-92 (1st Cir. 2005); *Slutzker v. Johnson*, 393 F.3d 373, 387 (3d Cir. 2004); *Crivens v. Roth*, 172 F.3d 991, 998-99 (7th Cir. 1999).

Here, the government argues that any impeachment value from the Epps letters was cumulative of other impeachment at trial. But showing (as the defense did) that Epps had a long criminal record, lied all the time, and was testifying as part of a deal with prosecutors is not the same as showing that he was willing to use his position in the prosecution to get even with gang members who had crossed him. This was a new and potentially powerful line of inquiry that the defense could have used to undermine the value of Epps's testimony.

Nevertheless, showing that the Epps letters would afford a unique basis for impeachment does not end the materiality inquiry. The question is whether there was a reasonable probability of a different verdict had the letters been disclosed, *Kyles*, 514 U.S. at 433, and here there was not. Undisclosed impeachment evidence would not produce a different result if the testimony of the witness against whom it is offered was strongly corroborated by other evidence. *See Conley*, 415 F.3d at 190-91 (impeachment evidence material because witness provided the only credible evidence against defendant); *Horton v. Mayle*, 408 F.3d 570, 580 (9th Cir. 2005) (same); *Slutzker*, 393 F.3d at 378 (same); *Crivens*, 172 F.3d at 998 (same). Here, Epps's testimony was by no means the only—or even the best—evidence that Armstead, Wilson, and Thomas participated in the GD drug conspiracy. That evidence is extensive: Armstead was recorded discussing the drug business and his role in it in a

half-dozen meetings and phone calls,[2] and Wilson and Thomas both participated, in concert with other GD members, in numerous drug sales to undercover agents. Moreover, the other cooperating co-defendants also confirmed the appellants' role in the conspiracy. The appellants cling to an instance in which the district court referred to Epps's testimony as the "centerpiece" of the government's case, but that is not the whole story. A full transcription of the passage in question shows that the district court, in denying the motion for a new trial, felt that other evidence corroborated Epps's testimony:

> The question I have to consider is whether it's reasonable to believe this could have made a difference. I know one of the arguments the government has made is that there was substantial evidence apart from Epps's testimony that the jury could have relied upon to find a—to find the defendants in this case guilty. Mr. Epps's testimony was lengthy and certainly was a centerpiece or a large section of the government's proof, but it wasn't all that the government had in support of the convictions in this case.

In light of the substantial amount of evidence that corroborated Epps's testimony, the government's failure to disclose further impeachment material against Epps does not undermine our confidence in the verdict. The district court did not abuse its discretion in denying the motion for a new trial.

---

[2] For this reason, Armstead's perfunctory challenge to the sufficiency of the evidence supporting his conviction for conspiracy fails.

**B. Armstead's additional trial issues**

In his motion for a new trial, Armstead raised several other issues beyond the *Brady* claim discussed above. The district court did not abuse its discretion in denying the motion. Armstead first contends that the district court wrongfully admitted evidence of his prior bad act, *see* Fed. R. Evid. 404(b), when it allowed testimony that he had ordered the beating (or "violation," in GD parlance) of a wayward gang member. But this evidence was not a prior bad act; it was part of the conspiracy, showing Armstead's leadership role and shedding light on how the GDs enforced their drug sale policies. *See United States v. Hernandez*, 330 F.3d 964, 970-71 (7th Cir. 2003) (evidence of beatings admissible to show how drug-selling gang conducted business).

Next, Armstead argues that the district court erred by allowing the government to provide the jury with a transcript of the October 2001 meeting, the tape recording of which was played at trial but was difficult to hear. (The gang meeting was held in a public park near a noisy highway, perhaps, the government suggests, for the very purpose of frustrating any turncoats wearing a wire.)[3] A district court has broad discretion to admit a transcript of an audio recording as an aid to the jury. *United States v. Breland*, 356 F.3d 787, 794-95 (7th Cir. 2004). Moreover, the district court repeatedly admonished the jury that only the tape was evidence, and that if jurors could not make out parts of the recording, they should disregard the corresponding portions of the transcript. That is all our precedents require. *See United States v. Ceballos*, 385 F.3d 1120, 1124 (7th Cir. 2004).

---

[3] The defense's proffered expert witness in voice identification was unable to make a positive identification of Armstead's voice on the tape. The expert conceded, however, that the transcript of the October 2001 meeting seemed generally accurate.

Armstead next contends that the district court should have given an entrapment instruction. (The government directed cooperating co-defendant Collins to call Armstead in order to talk about drugs.) But when Armstead requested the instruction, the district court demanded an offer of proof that he could put on an entrapment defense, and Armstead did not pursue the matter further. We cannot say that we are surprised: an entrapment defense would have required showing that Armstead was induced to perpetrate a crime he was not predisposed to commit. *United States v. Burke*, 425 F.3d 400, 408-09 (7th Cir. 2005). Before Collins's phone calls, Armstead was caught in several meetings and phone conversations discussing the substantial drug business over which he presided. He could not possibly have disproven his predisposition to commit further drug crimes.

Finally, Armstead argues that the district court erred by denying his motion to sever his trial from the trials of Wilson and Thomas. But there is a strong preference that co-conspirators be jointly tried, particularly when they were indicted together. *See United States v. Souffront*, 338 F.3d 809, 828 (7th Cir. 2003). Moreover, a defendant challenging the denial of a motion to sever must show actual prejudice, *id.*, and Armstead does not do this. He contends that separate trials would have allowed him to examine Wilson and Thomas as witnesses, but all he says they would have shown is that he did not personally sell drugs at the 340 building. Even assuming that he could get his co-defendants to testify on his behalf, Armstead was charged as the leader who controlled the conspiracy from afar. The fact that he didn't sell drugs himself proves nothing.

## C.  Sentencing matters

Armstead, Wilson, and Cohn raise various challenges to their sentences. As the outset, Cohn's appeal must be

dismissed. He pleaded guilty, and his plea agreement contains a waiver of the right to appeal any sentence lower than the statutory maximum except for a claim of involuntarily pleading guilty or receiving ineffective assistance of counsel during plea negotiations. (Those claims, if successful, would undercut the guilty plea itself, and would allow an appeal since a plea waiver stands or falls with the plea agreement. *United States v. Whitlow*, 287 F.3d 638, 640 (7th Cir. 2002).) Cohn does not mention the waiver at all; he simply plunges ahead with his sentencing argument. Waivers of appeal are enforceable, *Roberts v. United States*, 429 F.3d 723, 724 (7th Cir. 2005), and since Cohn does not seek to rescind his guilty plea or otherwise overcome the waiver, we have no choice but to dismiss his appeal.

### 1.  Armstead's sentencing issues

Armstead makes three sentencing arguments. The first two are his alone; the third he shares with Wilson. Armstead's first argument is that the district court erred by finding him responsible for 1.5 kilograms of crack cocaine. We review the district court's findings as to drug quantity for clear error. *United States v. Romero*, 469 F.3d 1139, 1147 (7th Cir. 2006). Armstead contends that since he only joined the conspiracy in September 2001—a fact that the government does not dispute—he could not possibly have overseen the sale of 1.5 kilograms of crack cocaine. The argument is meritless. Armstead is liable for the reasonably foreseeable amount of drugs sold by his co-conspirators. *See United States v. Olson*, 450 F.3d 655, 685 (7th Cir. 2006). The district court relied on the calculations of the presentence report, in which the probation office noted that Butts and Banks alone admitted to selling 2.5 and 3 kilograms respectively between fall 2001 and late summer 2002. Armstead has no response to this.

In addition to Butts and Banks, several dozen other individuals under Armstead's control were selling crack from the 340 building. It is clear, then, that Armstead was easily responsible for 1.5 kilograms, and that the district court did not clearly err. *See United States v. Jones*, 454 F.3d 642, 651-52 (7th Cir. 2006).

Next Armstead contends that the district court wrongfully denied his motion for a downward departure for "cultural assimilation." At sentencing, Armstead's counsel clarified that the crux of this argument was that Armstead was raised in the Chicago projects, where a culture of violence, economic hopelessness, and drug abuse doomed him to a life of crime. This was an awkward shoehorn into a claim for departure based on cultural assimilation, which ordinarily pertains to aliens who have illegally reentered the United States after being deported and seek a reduced sentence for the crime of reentry because they had adapted to life in this country. *E.g.*, *United States v. Roche-Martinez*, 467 F.3d 591, 595 (7th Cir. 2006). Indeed, considered on its merits rather than by the title Armstead has chosen, the argument was probably foreclosed at the time of sentencing by U.S.S.G. § 5H1.12, which treats "circumstances indicating a disadvantaged upbringing" as a forbidden sentencing factor. *See generally United States v. Pullen*, 89 F.3d 368 (7th Cir. 1996). We think the appropriate place for this argument, if there is one, is under the factors set forth in 18 U.S.C. § 3553(a). *See United States v. Wallace*, 458 F.3d 606, 608-09 (7th Cir. 2006). Since, as explained below, Armstead is entitled to a limited remand under *United States v. Paladino*, 401 F.3d 471 (7th Cir. 2005), he can make this argument to the district court.

### 2.   Armstead's and Wilson's joint sentencing issue

Finally, Armstead and Wilson contend that they are entitled to remands for resentencing because their sen-

tences were imposed prior to the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005). Armstead does not contend that he objected at sentencing to the mandatory application of the Guidelines; Wilson does, but he is mistaken. He argued at sentencing that various enhancements based on facts found by the judge were unsupported by the evidence. That is not the same as an argument that increasing the sentence violated the Sixth Amendment or *Apprendi v. New Jersey*, 530 U.S. 466 (2000). *See United States v. Garcia*, 439 F.3d 363, 368-89 (7th Cir. 2006); *United States v. Schlifer*, 403 F.3d 849, 854 (7th Cir. 2005). Review therefore is for plain error only, and both defendants are entitled to a limited remand under *Paladino* to determine whether the district court would impose the same sentence if required to resentence under an advisory Guidelines regime.

Armstead and Wilson seek more—they want us to overrule *Paladino*. They argue that the factors in 18 U.S.C. § 3553(a) took on new significance after *Booker* such that they would now wish to present (and support with new evidence) a more comprehensive argument under the factors than they did at the original, pre-*Booker* sentencing hearing. We have already declined several invitations to abandon *Paladino*—*see United States v. Brock*, 433 F.3d 931, 938 (7th Cir. 2006); *United States v. Re*, 419 F.3d 582, 583 (7th Cir. 2005)—and we decline this one as well. It is true that the *Paladino* process is a limited one in which the district court is confined to the original record, along with arguments from the parties. *See United States v. Bonner*, 440 F.3d 414, 417 (7th Cir. 2006); *Paladino*, 401 F.3d at 484. But the defendants are free to submit vigorous arguments under the § 3553(a) factors, and if any of those points requires new evidence, counsel can make a proffer to the district court. If the argument is promising enough that the district court is inclined to resentence, then we

will remand for full resentencing and any new evidence can be introduced at the new sentencing hearing.

### D.  Collins's counsel's motion to withdraw

The last matter to be settled is the motion to withdraw filed by Collins's counsel under *Anders v. California*, 386 U.S. 738 (1967). Counsel contends that any appeal would be frivolous. Because his brief is facially adequate, we confine our review to the potential issues that he raises, along with those that Collins himself identifies in a response under Circuit Rule 51(b). *United States v. Schuh*, 289 F.3d 968, 973-74 (7th Cir. 2002).

Collins cooperated with the government and was rewarded with a sentence of half the bottom end of his Guidelines range. He received 180 months' imprisonment, compared to his co-defendants' sentences ranging from 240 months to life. Collins's plea agreement, like Cohn's, contains a waiver of the right to appeal. But as we noted above, a plea agreement that is entered into involuntarily or as a result of ineffective assistance from counsel cannot stand, and the waiver of appeal would fall with the plea agreement. Collins contends in his Rule 51(b) submission that he could raise both of these points in an appeal. Either argument, however, would be frivolous. Collins stated in open court that he understood his rights under Federal Rule of Civil Procedure 11, and that his guilty plea was knowing and voluntary. He would therefore face an uphill struggle in convincing an appellate court otherwise. *United States v. Cieslowski*, 410 F.3d 353, 358 (7th Cir. 2005). Collins does not say in what way the district court's colloquy under Federal Rule of Criminal Procedure 11 was insufficient, and we see none. Nor does he give any specifics as to how counsel rendered ineffective assistance in advising him to accept the plea agreement. Indeed, there is no evidence in the record of

counsel's advice, which is why an ineffective assistance claim is more appropriately raised in a collateral proceeding than on direct review. *See, e.g.*, *United States v. Harris*, 394 F.3d 543, 557 (7th Cir. 2005).

### III.  CONCLUSION

For these reasons, we AFFIRM the convictions of Armstead, Wilson, and Thomas; order a LIMITED REMAND as to the sentences of Armstead and Wilson; DISMISS Cohn's appeal; and GRANT counsel's motion to withdraw and DISMISS Collins's appeal.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*