In the

# United States Court of Appeals
## For the Seventh Circuit

―――――――――

Nos. 05-3904, 05-3944, 05-3946, 05-3947, 05-4284, 06-2779

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ANDRE SEYMOUR, ARTREZ N. SEYMOUR,
KENT CLARK, ANDRE LAWRENCE,
STACIA SMITH AND TROY LAWRENCE,

*Defendants-Appellants.*

―――――――――

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 CR 200—**Wayne R. Andersen,** *Judge.*

―――――――――

ARGUED JANUARY 18, 2008—DECIDED MARCH 24, 2008

―――――――――

Before BAUER, FLAUM, and SYKES, *Circuit Judges.*

BAUER, *Circuit Judge.* Defendants-Appellants Andre Seymour, Artrez Nyroby Seymour ("Nyroby Seymour"), Kent Clark, Andre Lawrence, Stacia Smith, and Troy Lawrence (collectively, the "Defendants") appeal their respective sentences, claiming that their Sixth Amendment rights were violated when the district court sentenced all Defendants under 21 U.S.C. § 841(b)(1)(A) without having the jury make individualized findings

regarding the quantities of drugs reasonably foreseeable to each defendant. Defendant Stacia Smith also asserts that the district court erred by not suppressing a gun found in Smith's possession during a January 2002 traffic stop, and that the district court abused its discretion when it denied her motion for a mistrial on the gun-related charge. In addition, Smith contends that there was insufficient evidence to support her conviction on the gun-related charge. Defendant Andre Lawrence also appeals his conviction on the gun-related charge, claiming the evidence was insufficient to support his conviction. For the following reasons, we affirm.

## I. Background

All six Defendants were convicted, amongst numerous other charges, for conspiring to knowingly and intentionally possess with intent to distribute fifty grams or more of cocaine base, commonly known as "crack," within one thousand feet of an elementary school, in violation of 21 U.S.C. §§ 841(a)(1) and 860(a). Defendants Smith and Andre Lawrence were also convicted of knowingly possessing a firearm in furtherance of drug trafficking, in violation of 18 U.S.C. § 924(c).

### A. Drug Trafficking Operations

From the early 1990s until March of 2002, the Defendants were involved in a crack trafficking organization ("the Organization") in Chicago Heights, Illinois. The Organization initially sold crack in an area known as Wentworth Gardens. While at Wentworth Gardens, the Organization sold crack twenty-four hours a day, seven days a week.

During the Wentworth Gardens era, defendants Troy Lawrence, Kent Clark, Stacia Smith, and Nyroby Seymour were among those working for the Organization.

In the late 1990s, the buildings around Wentworth Gardens were condemned and torn down. The Organization then moved to Claude Court, a different area in Chicago Heights that was surrounded by public housing. The Claude Court drug sales location was less than one thousand feet from an elementary school. The Organization was the only group selling crack in the Claude Court area. During the Claude Court era, defendants Andre Lawrence and Andre Seymour joined the Organization; Nyroby Seymour, Troy Lawrence, Kent Clark, and Stacia Smith remained members.

After the relocation, the basic structure of the Organization remained the same: Troy Lawrence was the leader and was responsible for buying the powder cocaine from his suppliers. He stored the cocaine at one of the Organization's stash houses, which were the residences of Organization members. The cocaine was cooked into crack at the stash houses. Once the crack was prepared, other members of the Organization, referred to as "baggers," bagged the crack into small plastic bags, then fifty of the little bags were placed into a larger bag, called a "fifty pack."

After the crack was packaged into fifty packs, a member of the Organization referred to as a "runner" would bring the crack to the sales area—either Wentworth Gardens or Claude Court, depending on the time frame— and deliver it to another member, called the "shift runner" or "shift supervisor." The runner would also pick up drug sale proceeds from the shift supervisor. The shift supervisors were the managers of the sales area. When the area was running low on crack, the shift supervisors

would make calls to other members of the Organization to have runners deliver more. After receiving the crack from the runner, shift supervisors gave it to a member of the Organization referred to as a "packman." The packman was responsible for the actual drug-money exchange with the customer.

The Organization also had members that were assigned to security to monitor the drug sales area, watching for law enforcement or anyone looking to rob a member of the Organization. Members on security assignment, as well as other members of the Organization, often carried guns for protection. Members of the Organization also drove cars with hidden "trap compartments," where they could conceal guns and drugs.

### B.   Organization Drug Orders and Stash Houses

One of Troy Lawrence's cocaine suppliers, Mark Connor, testified that he sold powder and crack cocaine to Troy Lawrence on and off from 1997 to March 2002. When Troy was unavailable, Connor would call Andre Lawrence, Troy's cousin. At first, Connor sold powder cocaine to Troy Lawrence once or twice a week in 4.5 ounce quantities, which Troy then cooked into crack. As time went on, Troy bought larger quantities of cocaine, including deals for half and full kilograms. Sometime in 1997, Connor cooked up a half kilogram of cocaine for Troy Lawrence after Troy questioned the quality of the cocaine Connor was selling. From early 2000 to November of 2001, Connor heard from Troy Lawrence once or twice a week for a couple of weeks, but then would not hear from him for a few months at a time. During November and December 2001, Troy bought cocaine from Connor more fre-

quently and in greater quantities, ranging from one to three kilograms per transaction.

Troy stored the cocaine at the Organization's stash houses. Smith's home in Lynwood, Illinois, a Chicago apartment referred to as "the Hideout," and Andre Lawrence's home in Chicago were Organization stash houses. Troy and another of his cocaine suppliers, "JT," frequently discussed cocaine deals in Smith's apartment, and both Smith and Andre Lawrence knew that the Organization was storing cocaine in their homes. Connor delivered cocaine to Troy at a restaurant Troy owned, as well as at the Hideout and Andre Lawrence's house. Between 1999 and 2002 alone, Connor delivered cocaine to Andre Lawrence's house an estimated twenty times. On approximately ten occasions while inside Andre Lawrence's house, Connor saw members of the Organization, including Andre Lawrence, bagging crack; on one occasion around Christmas of 2001, Connor saw Andre Lawrence take a gun out of the waistband of his pants and place it on a television inside the house. Connor also delivered cocaine to the Hideout on approximately five to ten occasions.

Levert Griffin, a member of the Organization who served as a runner at both Wentworth Gardens and Claude Court, testified that the Organization used Smith and Andre Lawrence's residences to store and bag crack. Griffin testified that he personally bagged crack with Andre Lawrence and other individuals inside Andre Lawrence's house and that on one occasion at Andre Lawrence's house, he saw a black handgun in the bedroom. Griffin also bagged crack at Smith's apartment with other individuals, including Andre Seymour, who worked as a shift supervisor for the Organization. From

time to time and at Troy Lawrence's direction, Griffin purchased cocaine in approximately one kilogram quantities from suppliers JT and Connor. After purchasing the cocaine, Griffin brought the drugs to Smith's apartment, where Griffin knew drugs and drug proceeds were stored for the Organization.

In February of 2002, Troy Lawrence began paying for Organization member Tasha Deere's apartment in Chicago Heights. Deere's apartment was then used as a stash house, and members of the Organization were there bagging crack every day. Troy brought crack to Deere's house, and at least five members of the Organization bagged it, including Andre Seymour and Troy. Deere's apartment was also used to stash drug proceeds, which Troy would pick up every two to three days.

### C.  Investigation of the Organization

Federal law enforcement began investigating the Organization's drug trafficking operations in July of 2000. Federal agents received court authorization to place wire taps on Griffin's and Troy Lawrence's telephones and to intercept text messages sent to pagers that belonged to Troy Lawrence and another Organization member named Cameron Wilson.

On various occasions, both the Chicago Heights Police and federal law enforcement agents seized drugs, drug proceeds and firearms from members of the Organization. For example, on July 5, 2000, the Chicago Heights Police officers seized forty-four small plastic bags containing crack dumped by Nyroby Seymour as he ran from police; after the chase, Nyroby was arrested (for the second time) for selling crack. Three days later, the Chicago Heights

Police seized over $16,000 in cash from Troy Lawrence and his vehicle.

In October of 2000, law enforcement stopped Smith while she was driving her car near the Claude Court drug sales location. The officers had seen Smith take a white plastic grocery bag from a man in the drug sales area and drive away. While she drove away the officers noticed an unrestrained child in the front seat and decided to stop her. The officers asked Smith (who was pregnant at the time) if she had any drugs or weapons in the car, to which she replied that she did not. The officers then asked for permission to search her purse and car, and Smith agreed.

While searching Smith's purse, the officers found a white plastic bag, which contained cash and slips of paper with names or aliases written on them. The officers seized the contents of the plastic bag, gave Smith a receipt for the items, and allowed Smith to leave. The evidence obtained from this traffic stop was later suppressed by the district court.

On December 26, 2001, runner Griffin was stopped by Chicago Heights Police officers and was found to have a gun and 10.9 grams of crack in a trap compartment of his car. On January 7, 2002, Kent Clark was stopped in Glenwood, Illinois, and officers found $7,539 wrapped in a rubber band inside a plastic bag, which he was transporting on behalf of Troy Lawrence and the Organization.

On January 24, 2002, officers searched Organization member Tasha Deere's vehicle and found 227 grams of crack in a trap compartment. That same day, officers stopped Smith in her car after intercepting a phone call from Troy Lawrence placed at 11:23 p.m. During that call,

Troy Lawrence had instructed Smith to: "[G]et up. Put something on. Bring me that black box that's in your closet." Smith responded, "In my closet?" Troy Lawrence then said: "The black box. You know my know my thing in there. You hear me?" Smith replied, "Yeah, yeah, yeah, yeah." Troy Lawrence then told her a second time to "[h]urry up." Moments later, officers stopped Stacia Smith and found a black box on the passenger seat with the words "Intra Tec" written on the outside of the box. Inside the box, officers found a loaded Intra Tec Model AB10 semi-automatic handgun.

On January 27, 2002, officers stopped Organization member Cameron Wilson, searched his vehicle and seized 211 grams of crack. On February 5, 2002, officers chased a vehicle driven by Organization supplier JT. During the chase, JT dumped approximately 4.4 kilograms of powder cocaine out of the window.

On March 5, 2002, officers searched Troy Lawrence's home in Hammond, Indiana. They found approximately $171,980 in cash, a money counter, two firearms, a flash suppressor, and firearm ammunition. That same day, officers searched three Organization stash houses. At the Hideout, officers found 496.4 grams of powder cocaine and various drug paraphernalia, including bags and seals. At Andre Lawrence's house, they found $5,535 in cash, two loaded guns (a Berretta and a Salvage), ammunition, a bullet proof vest, plastic bags, seals, and a safe containing another $4,000. The Salvage was found in the front room of the house, while the Berretta was found in the bedroom together with Andre Lawrence's wallet, bullet proof vest, ammunition for both guns, and the safe. At Tasha Deere's apartment, officers found 297.8 grams of cocaine base.

In addition to these seizures, law enforcement agents working in an undercover capacity between April and June of 2001 made seven controlled purchases of crack totaling 172.2 grams at the Organization's Claude Court drug sales area.

On July 16, 2002, the Defendants were indicted for conspiring to distribute and for possession with intent to distribute crack within one thousand feet of an elementary school (amongst other charges), and a jury trial ensued.

### D.  Trial Testimony

In addition to the law enforcement arrests, seizures, and undercover purchases of crack from members of the Organization, several witnesses at trial testified as to the amount of crack produced and sold by the Organization. As noted above, Organization drug supplier Connor testified as to his sales with the Organization. Runner Griffin also testified as to the Organization's operations. Griffin estimated that he delivered $4,000 to $10,000 worth of crack in a single eight-hour shift, which amounted to between 400 and 1000 bags of crack.

Green Sallis, a shift supervisor for the Organization at Wentworth Gardens and Claude Court, testified that in early 2002, he went to Tasha Deere's apartment, where Andre Lawrence (at Troy Lawrence's direction) gave him a softball-sized or football-sized piece of crack to be bagged. He also testified that Stacia Smith dropped off drugs or picked up money from him at Claude Court approximately twenty to thirty times.

Darren Stewart, a member of the Organization since 1996 and a packman from 1997 to 1999, testified that as

a packman, he worked at Wentworth Gardens seven days a week, eight hours a day selling crack to customers. Kent Clark, a shift runner, supplied Stewart with the crack he sold. Stewart estimated that the Organization sold $20,000 worth of crack cocaine each day.

### E.   The Defendants' Roles in the Organization

Troy Lawrence was the leader of the Organization from its inception in the early 1990s until his arrest in 2002. Troy did most of the cocaine purchasing from the Organization's suppliers, including several deals for kilogram quantities of cocaine. He also handled all of the drug proceeds of the Organization's drug sales. Troy was aware of all the stash houses' operations and directed members of the Organization regarding operations for every shift. He held meetings to discuss the operations with everyone working in the drug sales areas, and made decisions regarding who was disciplined and how. Troy also determined what each member of the Organization was paid on a weekly basis and whether they would move up in the Organization.

Kent Clark worked for the Organization from 1996 until his arrest in January of 2002. Clark worked as a shift supervisor at Wentworth Gardens. When the Organization operated at Claude Court, Clark collected drug proceeds and transported money for the Organization.

Andre Seymour worked as a shift supervisor for the Organization for approximately two years at the Claude Court drug sales location. During his tenure, he received drugs and handled drug proceeds, bagged crack at the stash houses, participated in Organizational beatings to

enforce discipline, attended Organization meetings, and obtained a gun for the Organization.

Nyroby Seymour began working for the Organization in 1998 and continued until at least 2001. At Wentworth Gardens and Claude Court, Nyroby worked as a pack-man and as security.

Smith, Troy Lawrence's girlfriend, worked for the Organization for an uncertain but undoubtedly long period of time. She worked for the Organization at both Wentworth Gardens and Claude Court as a runner and operated a stash house. Smith's home was used to conduct drug deals for wholesale quantities of cocaine, as well as to store those drugs and drug proceeds. Members of the Organization frequently bagged crack at Smith's house with several other members. According to Sallis, Smith delivered drugs or picked up money approximately one hundred times at Wentworth Gardens and approximately twenty to thirty times at Claude Court. Stewart also testified that Smith delivered drugs twice a week at Wentworth Gardens. Law enforcement intercepted a call from Troy Lawrence to Smith in which he told her to get $4,000 worth of crack, or roughly one hundred grams, to another member.

Andre Lawrence worked for the Organization from at least 1999 to 2002. He transported crack, received co-caine deliveries from Organization supplier Connor, and bagged crack. Most significantly, Andre Lawrence oper-ated a stash house for the Organization out of his home. Sallis testified that Andre Lawrence was present at his home on numerous occasions when others cooked up and bagged crack there. On one occasion, Andre Lawrence gave Sallis a softball or football-sized piece of crack to be bagged. During the investigation, law enforcement

intercepted several phone calls between members of the Organization, including a call between Sallis and Troy Lawrence in which Sallis was trying to pick up a "big mac," or approximately 500 grams of crack from Andre Lawrence's house.

## F.   The Verdict and Sentencing Hearings

On December 18, 2003, all six Defendants were convicted of conspiring to distribute and to possess with intent to distribute a controlled substance—cocaine and cocaine base—within one thousand feet of an elementary school, in violation of 21 U.S.C. §§ 841(a)(1), 860(a), and 846. In finding the Defendants guilty, the jury filled out a verdict form that asked them to make a general determination as to whether a conspiracy to distribute or possess a certain amount of cocaine base had been proven beyond a reasonable doubt. The verdict form did not ask the jury to determine the amount of cocaine base attributable to or reasonably foreseeable by any particular Defendant. The jury determined that the government had proved beyond a reasonable doubt that the conspiracy involved more than fifty grams of cocaine base. The jury also found Smith and Andre Lawrence guilty of possessing a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c).

Amongst other post-trial motions, defendants Andre Seymour, Kent Clark, Andre Lawrence, and Nyroby Seymour requested that the district court sentence them under § 841(b)(1)(C), which governs distribution of less than five grams of cocaine base, instead of § 841(b)(1)(A), which governs distribution of more than fifty grams of cocaine base. The district court denied these and other

post-trial motions, and all six Defendants were sentenced under § 841(b)(1)(A).

At each of the Defendants' respective sentencing hearings, the district court noted that the jury finding that the conspiracy involved more than fifty grams of cocaine base carried a maximum statutory sentence of life imprisonment. The district court determined that, consistent with the jury's quantity finding, the conspiracy involved more than 1.5 kilograms of cocaine base, and therefore all six Defendants had base offense levels of thirty-eight, before accounting for any enhancements, for sentencing purposes. Dependent upon a defendant's criminal history score, a base offense level of thirty-eight yields an advisory sentence under the Sentencing Guidelines ranging from 235 months to life imprisonment.

For the conspiracy conviction alone, the Defendants were sentenced as follows: (1) Troy Lawrence to life imprisonment;[1] (2) Andre Seymour to 324 months' imprisonment; (3) Nyroby Seymour to 300 months' imprisonment; (4) Kent Clark to 300 months' imprisonment; (5) Andre Lawrence to 300 months' imprisonment; and (6) Stacia Smith to 133 months' imprisonment. For the gun-related charges, Smith and Andre Lawrence were sentenced to ten years and five years, respectively, to run consecutive to the other counts.

---

[1] Because the jury had found Troy Lawrence guilty of eleven other charges in the indictment, and based on his having three prior felony drug convictions, the district court had no discretion with respect to Troy's sentence, and imposed the mandatory life sentence pursuant to 21 U.S.C. § 841(b)(1)(A).

## II.  Discussion

All six Defendants argue that the district court commit-ted an *Apprendi* violation when it failed to have the jury make defendant-specific drug quantity findings. Alterna-tively, Defendants contend that, even if a judge can make the defendant-specific quantity determination, the dis-trict court failed to do so. Defendants Smith and Andre Lawrence also seek to overturn their firearm convictions. We address each issue in turn.

### A.  Alleged *Apprendi* Error

*Apprendi* requires that a jury make "the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed." *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000). The Defendants claim that the Supreme Court's recent decision in *Cunningham v. California*, 127 S.Ct. 856 (2007), expanded the language of *Apprendi* and established that "any fact that exposes a defendant to a greater potential sentence must be found by a jury, not a judge, and established beyond a reason-able doubt." 127 S.Ct. at 863-64. Thus, the Defendants contend that their Sixth Amendment rights were vio-lated when the district court judge, and not the jury, determined that 1.5 kilograms of crack were attributable to each defendant.

An *Apprendi* issue is subject to *de novo* review. *United States v. Chemetco, Inc.*, 274 F.3d 1154, 1158 (7th Cir. 2001). As Defendants correctly stated, *Apprendi* held that a jury must find beyond a reasonable doubt "any fact [other than a prior conviction] that increases the penalty for a crime beyond the prescribed statutory maximum." 530 U.S. at 490. The Supreme Court defined the phrase "statutory

maximum" as set out in *Apprendi* as the maximum sentence a judge can impose without additional jury findings. *Blakely v. Washington*, 542 U.S. 296, 303-304 (2004).

Defendants are mistaken in their claim that the district court judge's finding that each defendant was responsible for 1.5 kilograms of crack in any way "increased" their potential maximum sentences. Any person who knowingly and intentionally distributes, or possesses with the intent to distribute fifty grams or more of a mixture or substance containing cocaine base has violated 21 U.S.C. § 841(a) and shall be sentenced under 21 U.S.C. § 841(b)(1)(A). *See* 21 U.S.C. § 841(b)(1)(A)(iii). The statutory maximum for a sentence pursuant to § 841(b)(1)(A) is life imprisonment. Because the jury found the Defendants guilty of a conspiracy involving fifty grams or more of cocaine base, the drug quantity determination for the conspiracy was determined beyond a reasonable doubt by the jury, as required. *See United States v. Flagg*, 481 F.3d 946, 949-50 (7th Cir. 2007) ("[D]rug type and amount sufficient to trigger the higher statutory maximum of §§ 841(b)(1)(A) or (B) [must] be charged in the indictment and found by the jury beyond a reasonable doubt or admitted by the defendant.") (internal quotations omitted).

The district court's determination that each defendant was responsible for 1.5 kilograms or more of crack involved in the conspiracy placed the Defendants into the base offense level of thirty-eight, which has a maximum sentence of life imprisonment. The district court judge's determinations regarding the drug quantity attributable to each defendant did not increase the penalty for the crime beyond the statutory maximum, as determined by the jury, of life imprisonment; thus, no additional facts were found that affected the Defendants' potential maxi-

mum sentences. There was no *Apprendi* error and Defendants' reliance on *Cunningham* is misplaced. *See United States v. Martinez*, Nos. 06-2021, 06-2041, ___ F.3d ___, 2008 WL 553557, at *3 (7th Cir. Mar. 3, 2008) (finding drug conspiracy defendants' reliance on *Cunningham* regarding judicial fact-finding in applying the Guidelines misplaced now that the Guidelines are merely advisory).

Furthermore, a jury need not make a defendant-specific drug quantity determination for a conspiracy charge. *United States v. Tolliver*, 454 F.3d 660, 669 (7th Cir. 2006); *United States v. Knight*, 342 F.3d 697, 710 (7th Cir. 2003). Once a jury has determined that a conspiracy involved a type and quantity of drugs, and has found a particular defendant guilty of participating in the conspiracy, the jury has established the statutory maximum sentence that any one participant in the conspiracy may receive. *See Knight*, 342 F.3d at 710. Once the drug quantity and type for the conspiracy as a whole are determined by the jury, the judge may lawfully determine the drug quantity attributable to each defendant and sentence him accordingly so long as that determination does not exceed the statutory maximum sentence determined by the jury. *Id.*; *see also United States v. Hollins*, 498 F.3d 622, 629 (7th Cir. 2007) (post-*Cunningham* decision reviewing a district court's findings of fact regarding drug quantity for clear error). "The rule, then, is that the government need only allege and prove to the jury the bare facts necessary to increase the statutory sentencing maximum for the conspiracy as a whole." *Id.*; *see Edwards v. United States*, 523 U.S. 511, 513-14 (1998).

All that remains of Defendants' argument is whether the district court judge erred in attributing 1.5 kilograms of crack to each defendant. We review the district court's

findings as to drug quantity for clear error. *Hollins*, 498 F.3d at 629; *United States v. Wilson*, 481 F.3d 475, 483 (7th Cir. 2007). For sentencing purposes, a criminal defendant convicted of a drug trafficking conspiracy is liable for the reasonably foreseeable quantity of drugs sold by his or her co-conspirators. *See Wilson*, 481 F.3d at 483; *United States v. Olson*, 450 F.3d 655, 685 (7th Cir. 2006). Reasonable foreseeability is a factual determination and is reviewed for clear error. *Olson*, 450 F.3d at 685. The government's burden in attributing drug quantities to a particular defendant does not require that it show that the defendant was involved in or even had direct knowledge of any particular transaction. *Hollins*, 498 F.3d at 630. "[R]easonable foreseeability refers to the scope of the agreement that [a defendant] entered into when he joined the conspiracy, not merely to the drugs he may have known about." *Id.* (quoting *United States v. Flores*, 5 F.3d 1070, 1083 (7th Cir. 1993)); *see also Martinez*, ___ F.3d ___, 2008 WL 553557 at *4 (" 'Reasonable foreseeability' is thus a qualification to holding one conspirator accountable for the conduct of others."). "[A]lthough evidence of drug quantity must be more than speculative . . . the sentencing guidelines permit *some* amount of reasoned 'speculation and reasonable estimation' by a sentencing court." *Id.* at 631 (quoting *United States v. Jarrett*, 133 F.3d 519, 530 (7th Cir. 1998) (citing U.S.S.G. § 2D1.1)) (emphasis in original).

The district court was presented with substantial evidence that at least 1.5 kilograms of crack were sold and foreseeable during the various Defendants' involvement with the Organization. First, the Organization ran a large-scale crack distribution from the early 1990s until 2002, selling crack to customers twenty-four hours a day,

seven days a week, and employing approximately ten to fifteen people. Testimony from Organization members Stewart and Griffin also demonstrated that 1.5 kilograms of crack was hardly the tip of the iceberg for the Organization. Stewart testified that the Organization sold approximately $20,000 worth of crack a day, and that the Organization made approximately $1,000 per ounce of crack. Based on Stewart's estimates, the Organization sold 1.5 kilograms of crack in less than three days of work. Similarly, Griffin testified that he delivered crack to shift supervisors two to four times a day, delivering $4,000 to $10,000 worth of crack. Using the most conservative measure of Griffin's estimate, he alone delivered 1.5 kilograms of crack in less than fourteen days of work.

Moreover, the government seized a substantial amount of crack from the Organization. In a single three-day period, law enforcement seized 227 grams of crack from Tasha Deere and 211 grams from Cameron Wilson. Undercover purchases also yielded 172.2 grams of crack.

As the government points out, these quantities and calculations are just snapshots of the Organization's massive drug trafficking operation. They also demonstrate that an individual need not be involved in the Organization for more than a couple of weeks to be a part of 1.5 kilograms of crack sales. Based on the Defendants' critical roles and long tenures with the Organization, each defendant could reasonably foresee the involvement of 1.5 kilograms of crack in the Organization's drug trafficking operations.[2]

---

[2] Defendants also contend that allowing the judge to make an individualized quantity determination based on reasonable

(continued...)

We briefly address the Defendants' individual involvement in the conspiracy in turn to determine if the district court clearly erred in attributing 1.5 kilograms of crack to each defendant. We need not trouble ourselves with Troy Lawrence's sentence; the jury found Troy Lawrence guilty beyond a reasonable doubt of possession with the intent to distribute fifty grams or more of cocaine base on two other charges of the indictment. Troy's argument that the district court improperly found 1.5 kilograms attributable to him individually is irrelevant, because the jury had already made a specific quantity finding as to him. Troy Lawrence's *Apprendi* argument has no merit.

Kent Clark and Andre Seymour were shift supervisors for the Organization for approximately eight years and two years, respectively. As testimony at trial explained, shift supervisors were aware of the amount of crack going into the sales area to each packman from the runners. Both took on additional roles in the Organization as well. Clark collected and transported drug proceeds, and Andre Seymour bagged crack for the Organization at the stash houses. The evidence amply supported the district court's determination that 1.5 kilograms were attributable to both Clark and Andre Seymour.

Packman Nyroby Seymour also worked for the Organization for approximately three years. As a packman, Nyroby was at the sales location and had first-hand knowledge

---

[2] (...continued)
foreseeability creates possible sentencing ranges of "zero to life" in cases involving large conspiracies, such as this case, but very minor participants. As discussed herein, none of the Defendants even come close to qualifying as "minor participants," therefore we need not address these concerns.

of the amount of crack being sold. Based on his tenure and role in the Organization, 1.5 kilograms of crack were also reasonably foreseeable to Nyroby Seymour.

Both Stacia Smith and Andre Lawrence operated stash houses out of their homes for several years. Organization member Sallis's testimony indicated that Smith delivered crack to the drug sales areas on approximately 120 occasions. In addition to running a stash house, Andre Lawrence received cocaine deliveries for Troy Lawrence and participated in bagging the crack at the stash houses. Law enforcement intercepted a phone call in which Sallis was trying to pick up a "big mac," or 500 grams of crack, from Andre Lawrence's house. Again, based on the conservative calculations supported by the evidence and testimony at trial discussed above, 1.5 kilograms of crack were certainly foreseeable to both Smith and Andre Lawrence.

There was overwhelming evidence at trial that demonstrated the day-to-day involvement over extended periods of time of the Defendants, such that each of them could easily foresee that the conspiracy involved 1.5 or more kilograms of cocaine base. *See Knight*, 342 F.3d at 712; *United States v. Patterson*, 241 F.3d 912, 914 (7th Cir. 2001) (per curiam). Accordingly, we find no error in the district court's sentencing determinations.

We acknowledge that the district court did not explicitly determine that 1.5 kilograms of crack were reasonably foreseeable to the individual defendants. Instead, the district court began the sentencing hearings by concluding that the conspiracy undoubtedly involved at least 1.5 kilograms of crack, and that this was just a fraction of what was actually involved. But even if there was error in not attributing a defendant-specific finding

on the charges in this case, it would have been harmless given the evidence presented at trial and discussed throughout this opinion. *See Knight*, 342 F.3d at 712 (holding that a failure to make defendant-specific drug quantity findings was harmless error, given that the full weight of the drugs involved in the conspiracy was easily attributable to each defendant, the large scale of the drug trafficking organization, the defendants' roles in the organization, and the evidence of drug quantity established at trial) (citing *Neder v. United States*, 527 U.S. 1, 10-11 (1999)). Where a defendant's drug quantity is not submitted to the jury, for purposes of determining whether the error was harmless, we focus on the amount of drugs possessed by the conspiracy. *Id.* at 711. We do this because each of the defendants was convicted of conspiring with the others to distribute drugs, and as a member of the conspiracy, each defendant is accountable for the acts of all other conspirators within the scope of that agreement. *Id.*

### B. Stacia Smith's Firearm Conviction

Smith first asserts that the gun obtained during the January 2002 traffic stop should have been suppressed because the police lacked probable cause to conduct the search. Smith rests her argument on the district court's exclusion of the evidence obtained from the October 2000 stop, which Smith contends provided the only reasonable basis for law enforcement to suspect her involvement in the Organization's drug trafficking operations. Absent the October 2000 stop, Smith argues, the police lacked probable cause to make the January 2002 stop because Troy Lawrence's instruction to bring the "black box" to grandma's house could not give rise to any belief

that the black box was (or contained) contraband. Smith asserts that Troy Lawrence's instructions would have reasonably been perceived to be merely a "domestic favor." Smith also moved for a mistrial on the firearm charge on the basis that the gun should have been suppressed.

On appeal of a denial of a motion to suppress, this Court reviews a district court's legal conclusions *de novo* and findings of fact for clear error. *United States v. Dowthard*, 500 F.3d 567, 568-69 (7th Cir. 2007); *United States v. Mendoza*, 438 F.3d 792, 795 (7th Cir. 2006). "[A] vehicle may be stopped and searched without a warrant if there is probable cause to believe the vehicle contains contraband or other evidence of illegal activity." *United States v. Navarro*, 90 F.3d 1245, 1252 (7th Cir. 1996). Probable cause exists where "under the totality of the circumstances, it is fairly probable that the car contains contraband or evidence." *United States v. Webb*, 83 F.3d 913, 916 (7th Cir. 1996). Evidence obtained in violation of an individual's Constitutional rights cannot be used against the individual. *See United States v. Fields*, 371 F.3d 910, 914 (7th Cir. 2004).

Smith fails to consider the totality of the circumstances surrounding the January 2002 stop. Although the district court mentioned the fact that Smith had been stopped in October of 2000 and was found to possess drug proceeds from the Organization's operations, it did not rely on this evidence in its probable cause determination in a way that would taint the January 2002 stop. Law enforcement had obtained a warrant to intercept phone calls from Troy Lawrence's phone and had intercepted numerous calls to Smith, including two calls from Troy Lawrence instructing her to bring drugs to Organization

member Green Sallis. Throughout the phone taps, the conversations repeatedly used codes to communicate drug amounts, locations, and members' names. Based on these phone calls, police reasonably believed Smith to be a drug associate of Troy Lawrence and reasonably believed that "the black box" and "my thing" were code for contraband or illegal activity, and not merely a "domestic favor."

Furthermore, the law enforcement agent that stopped Smith that night testified that Smith was speeding. The gun was in plain view on the passenger seat of the car in the gun manufacturer's black case with name "Intra Tec" on the exterior of the box. Therefore, even if the police did not have probable cause based on the intercepted phone calls, the gun was properly admitted because the police had probable cause to make a traffic stop and the gun case in plain view would still be properly seized. *Dowthard*, 500 F.3d at 569 ("An officer has probable cause for a traffic stop when she has an 'objectively reasonable' basis to believe a traffic law has been violated."); *United States v. Raney*, 342 F.3d 551, 558-59 (7th Cir. 2003) (finding that if an officer is lawfully present, sees an object in plain view, and the incriminating nature of the object is readily apparent, an object can properly be seized pursuant to the plain view doctrine). There is no dispute that speeding is a violation of Illinois law, and there is no argument made that a reasonable officer would not have thought that Smith was not actually speeding. Accordingly, the gun was properly seized and admitted into evidence.[3]

---

[3] For the first time at oral argument, the parties suggested that the threshold for the January 2002 traffic stop was reasonable

(continued...)

Because the district court properly denied Smith's motion to suppress the gun, the district court did not abuse its discretion in subsequently denying Smith's motion for a mistrial regarding the gun charge. *See United States v. Mannie*, 509 F.3d 851, 856 (7th Cir. 2007) (a district court's refusal to grant a mistrial is reviewed for abuse of discretion); *United States v. Miller*, 276 F.3d 370, 373 (7th Cir. 2002) (same).

Having decided that the gun was properly admitted into evidence, we turn to Smith's assertion that there was insufficient evidence from which a rational trier of fact could determine, beyond a reasonable doubt, that she was guilty of possessing a gun in furtherance of the drug conspiracy. Specifically, Smith argues that the only evidence offered by the government to convict Smith of the gun-related charge was the recorded conversation between Smith and Troy Lawrence right before the law enforcement stopped her car and seized the gun. This evidence, Smith argues, does not demonstrate that Smith knowingly possessed the gun in furtherance of the drug conspiracy, as charged in the indictment.

The standard of review facing a defendant on her claim that the jury had insufficient evidence to convict is "a daunting one." *United States v. Hicks*, 368 F.3d 801, 804

---

[3] (...continued)

suspicion, and not probable cause. Because we find that the January 2002 traffic stop was supported by probable cause established without consideration of the October 2000 traffic stop, we need not address whether the search and seizure was justified by reasonable suspicion. *See United States v. Scott*, No. 07-1914, ___ F.3d ___, 2008 WL 426390, at *3 (7th Cir. Feb. 19, 2008).

(7th Cir. 2004). This Court's inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 804. This Court will not overturn a conviction based on insufficient evidence unless the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt. *United States v. Curtis*, 324 F.3d 501, 505 (7th Cir. 2003).

A reasonable jury could find that Smith knew she was transporting the gun, and based on the circumstances of Troy Lawrence's request for the gun, that it was to be used in the furtherance of the drug conspiracy. When Troy Lawrence requested the "black box" in her closet that contained his "thing," and then said to Smith, "You know my know my thing in there," Smith responded, "Yeah, yeah, yeah, yeah." This response could reasonably be interpreted by the jury as evidence that she knew exactly what Troy Lawrence was asking for that night. Even if Smith did not know what was inside the case, the case itself would have told her. Smith transported the gun in its black case, which had the name of the gun manufacturer, Intra Tec, written clearly on the outside of it.

The evidence also supports the jury's finding that Smith possessed the gun "in furtherance" of the drug conspiracy. Evidence must specifically tie the weapon to the drug trafficking activity. *United States v. Duran*, 407 F.3d 828, 840 (7th Cir. 2005). Factors that can be useful in distinguishing between mere possession of a firearm and possession in furtherance of a drug conspiracy include: (1) the type of drug activity that is being conducted; (2) accessibility of the firearm; (3) the type of weapon possessed; (4) whether the weapon is stolen; (5) the

status of the possession (legitimate or illegal); (6) whether the gun is loaded; (7) proximity to drugs or drug profits; and (8) the time and circumstances under which the gun is found. *Id.* at 840. "One legal theory that has been advanced and unanimously accepted, is that a possessed gun can forward a drug-trafficking offense by providing the dealer, his stash, or his territory with protection." *Id.*

Applying these factors to this case, the jury reasonably could have found that the weapon was possessed "in furtherance" of the drug trafficking operation. Smith was a key player in the Organization's operations that trafficked huge amounts of crack for almost a decade. Smith's home was a stash house for the Organization, and Smith possessed the gun in the closet of her home prior to transporting it to Troy Lawrence, the Organization leader, and at his direction. The gun was loaded and easily accessible to Smith inside her car when it was seized. Moreover, Troy Lawrence called Smith and requested the gun after eleven o'clock at night. Troy also made it clear that he was in a hurry to get the gun. Finally, an intercepted call between Troy and an individual named Dante Lawrence just before midnight that night showed that the gun was being brought to Troy in Chicago Heights—the center of the Organization's drug trafficking operations. Therefore, a reasonable jury could have found that Smith possessed the gun in furtherance of the drug conspiracy.

## C.  Andre Lawrence's Firearm Conviction

Andre Lawrence also argues that there was insufficient evidence from which a rational trier of fact could deter-

mine, beyond a reasonable doubt, that he was guilty of possessing a gun in furtherance of the drug conspiracy.[4] We disagree.

Revisiting the factors enumerated above, the jury's determination that Andre Lawrence possessed the guns in furtherance of drug trafficking is amply supported. Two guns were recovered from inside Andre Lawrence's house, which was used as a stash house for the Organization. The Berretta handgun was accessible, kept underneath the mattress of a bed. The Berretta was loaded and in the same room as a safe holding $4,000 in cash. The Salvage handgun was also loaded and accessible, concealed inside a couch in the front room of the house.

Moreover, the testimony elicited at trial supports the jury's finding that Andre Lawrence possessed the gun in furtherance of the drug conspiracy. Connor, one of the Organization's cocaine suppliers, testified that he saw Andre Lawrence with a gun in his waistband when he was at Andre Lawrence's house around Christmas of 2001. Connor said that Andre Lawrence removed the gun from his waistband and set the gun on the television while Connor and other Organization members were at his home bagging crack. Griffin, a runner for the Organization, also testified that he saw a handgun in Andre Lawrence's bedroom when he was bagging crack at Andre Lawrence's home. These two instances in which Andre Lawrence displayed a gun at an Organization stash house could reasonably be interpreted by the jury to be a message of protection of the drug conspiracy territory and

---

[4] Andre Lawrence does not challenge the knowledge element of his § 924(c) conviction.

its members. *See Duran*, 407 F.3d at 840-41 (rejecting sufficiency of the evidence challenge where gun was held in the conspiracy's headquarters for protection); *see also United States v. Castillo*, 406 F.3d 806, 814-18 (7th Cir. 2005). Accordingly, the evidence was sufficient to convict Andre Lawrence of possession of a firearm in furtherance of the drug conspiracy.

### III. Conclusion

For the foregoing reasons, we affirm all six Defendants' sentences, as well as the district court's denial of Smith's motion to suppress and motion for mistrial. We also affirm the firearm convictions of Smith and Andre Lawrence.