# In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 07-2839

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

WALTER THORNTON,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 CR 813—**James B. Zagel**, *Judge.*

_____

ARGUED MAY 13, 2008—DECIDED AUGUST 26, 2008

_____

Before EASTERBROOK, *Chief Judge*, and KANNE and
TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Walter Thornton was convicted
of attempted bank robbery, 18 U.S.C. § 2113(a), and of
possessing a firearm in furtherance of a crime of violence,
18 U.S.C. § 924(c). He moved for a judgment of acquittal
and a new trial; his motions were denied. The district
court sentenced him to 132 months' imprisonment. Thorn-
ton now appeals, raising four issues, but we need to
reach only two: his primary contention that the district

court erred in failing to properly instruct the jury on the elements of attempted bank robbery and his assertion that the evidence was insufficient to support a conviction on that charge and the related firearm count.

## I. Background

In September 2005, Walter Thornton and Tremain Moore worked together at a Shoe Warehouse in Berwyn, Illinois, where Thornton was the manager. They quickly became friends and, within a few days, Thornton—who had robbed a bank in Canada in 1994—began talking to Moore about how to rob a bank. Moore testified that on one occasion after he had been to a nearby Harris Bank, Thornton asked him about the bank's layout, drew sketches of the bank as Moore described it, and made maps of the surrounding area. According to Moore, prior to the robbery attempt, two men, one carrying a duffel bag, came to the Shoe Warehouse and met with Thornton in the back of the store. After they had left Thornton called Moore to the back and showed him a gun—the same gun the police later found in the store after the attempted bank robbery.

On September 26, Thornton and Moore arrived at the Shoe Warehouse by 9:30 a.m. Moore testified that Thornton said he was going to rob a bank and asked Moore to be his getaway driver, in exchange for some of the money and days off work. Moore stated that Thornton took him into the bathroom where he showed him the items he planned on using to disguise his appearance, including a bald cap, makeup to darken his complexion, and a pillow to make him appear heavier. According to Moore, he

waited for Thornton at the front of the store, and about fifteen minutes later Thornton appeared wearing black pants, white tennis shoes, a white dress shirt, and a gray ball cap. Thornton was wearing makeup, a full beard and a mustache, and his chest was larger and puffier, as if he had the pillow under his clothes. Moore told Thornton that anyone could tell that "something ain't right." So Thornton put on a black hooded sweatshirt, a "hoodie," thus adding to his disguise.

Moore testified that Thornton had him put an old license plate on Thornton's car which they would use as the getaway car. Moore pulled Thornton's car around to the back of the Shoe Warehouse and waited while Thornton returned to the store. After a few minutes, Thornton emerged from the store wearing the same disguise and carrying a duffel bag that appeared to have "stuff" in it. Moore drove Thornton's car through the alleys to Bank One, dropped off Thornton, and parked the car in a nearby alley to wait. Bank surveillance photos depict a passenger wearing dark colors, a hat, and a bandana over his face exiting the car and walking up to the bank's front exterior doors leading to the lobby.

Shortly before 10:00 a.m. Jaime Contreras was driving into Bank One's parking lot—he was going to the bank to conduct a personal banking transaction—when he observed an African-American male who appeared to be attempting to enter the bank. The man was wearing dark clothing and a hat, had a bandana over the lower portion of his face, and was carrying a dark-colored duffel bag. The man had his hand on the bank's exterior door handle.

Contreras and the man made eye contact, and one second later, the man walked away from the door, never having opened it. Contreras pulled up next to the man and asked, "What the f—— are you doing?" At trial Contreras explained that he said this because of the unusual situation at the bank—the man was masked and wearing pretty big clothing. After Contreras confronted the individual, the man began to panic and curse at Contreras. Contreras could not recall the exact words, other than "f—," because he was more worried about getting shot. Contreras responded, "Okay. You know, I didn't see nothing. I didn't do anything." Contreras testified that he was frightened because he saw the man reaching for something in his jacket pockets. He thought the man was reaching for a gun. Contreras said, "I'm sorry, I didn't see nothing," and tried to avoid any more contact with the masked man. Contreras drove away from the bank and then called 911. He explained that he drove away from the bank first because he did not want the man to shoot him if he saw him making the call.

Thornton ran from the bank and toward his car and Moore. Olga Salazar, who was driving to work at the nearby Harris Bank—ironically the one Thornton and Moore had planned to rob—saw him and thought she was witnessing a bank robbery. Salazar watched as he ran into the alley and jumped into the passenger side of the getaway car. She could see that the driver was an African-American male, wearing a blue and white collared shirt. Moore testified that Thornton said, "They saw me. They saw me." Thornton told Moore to drive and, as Moore drove, Thornton began taking off his clothing and disguise.

Salazar followed, keeping the car in view. At one point, she saw the front license plate—it was silver and said "Pontiac." She also saw the passenger taking off his clothes in the car. Salazar observed the license plate and later informed police that the plate number was 447171. The driver parked the car near the Shoe Warehouse and Salazar watched as the two men ran into the store. She went to the Harris Bank and the police were called.

According to Moore, Thornton told him to remove the old license plate from his car. He did. Meanwhile Thornton was in the bathroom, changing his clothes again and cleaning the makeup from his face. Moore testified that Thornton went to the front of the store to make it seem as though it was "business as usual" and asked Moore to check the bathroom to make sure all the makeup and any other evidence of the crime was gone.

A while later, police officers from the Berwyn Police Department arrived. They questioned Thornton and Moore. Detective Thomas Tate searched Thornton's Pontiac. Near the car he found a fake mustache. Inside the car he found another fake mustache, sunglasses, a white pillow, sketches of a bank's layout—the Harris Bank—and two receipts for spirit gum and three bald caps. The police searched the Shoe Warehouse. In the back room Sergeant Thomas Bojovic found a damp white T-shirt. He saw a ladder leaning against the wall and several missing ceiling tiles, so he climbed the ladder and looked into the ceiling. There he discovered a dark blue duffel bag, which contained a men's black hoodie, a men's white button dress shirt, a pair of dark pants, a red bandana, black makeup

and applicators, a gray ball cap, other disguise items, and an Intratec 9-millimeter (TEC-9) machine gun. Sgt. Bojovic also found a shopping bag containing an Illinois license plate, number 4421211, black costume makeup, sponges and other applicators, a container for false hair, and a bald cap.

Sgt. Bojovic interviewed Salazar at the Harris Bank. He then took her to the Shoe Warehouse where she identified Thornton's car as the one she had seen earlier but with a different license plate. Salazar immediately identified Moore as the driver and Thornton as the passenger of the car she had followed, indicating, though, that Thornton had changed clothes and had a lighter complexion. (At trial Salazar also identified Thornton as the passenger of the car.) The police asked Contreras if he could identify Thornton as the man he had seen at Bank One. Contreras thought Thornton could have been the same person, but he was not sure because his appearance had changed.

A grand jury charged that Thornton, by force and violence or intimidation, attempted to rob Bank One on September 26, 2005, in violation of the first paragraph of 18 U.S.C. § 2113(a). He also was charged with possessing a firearm in furtherance of a crime of violence in violation of 18 U.S.C. § 924(c). The case was tried to a jury. On direct examination, Thornton admitted that he and Moore had discussed robbing a bank and he testified that he had robbed a bank in Canada. On cross-examination, the government brought out the details of the Canadian robbery, including that Thornton had a gun. The jury found Thornton guilty as charged. He moved for a judg-

ment of acquittal under Federal Rule of Criminal Proce-
dure 29(a) and (c) and moved for a new trial under Rule 33.
The district court denied his motions, entered judgment on
the jury's verdicts, and sentenced Thornton to 132 months'
imprisonment: 72 months on the attempted bank robbery
and the mandatory minimum of 60 consecutive months
on the firearm count. He appeals.

## II. Analysis

Thornton raises several issues on appeal. He first
argues that the district court erred in instructing the jury
that they could find him guilty of attempted bank robbery
as alleged in Count One of the indictment if they found
that he "acted to attempt to take [Bank One's] money by
force and violence or by intimidation." He next contends
that his firearm conviction must be vacated because
attempted bank robbery by attempted intimidation is not
a crime of violence. He also challenges the sufficiency of
the evidence to convict him of both the attempted bank
robbery and the firearm charges. Lastly, he argues that
the court abused its discretion in admitting evidence of
his prior bank robbery conviction under Rule 404(b) of
the Federal Rules of Evidence, but given our resolution
of the other issues, we do not reach this argument. We
begin with the challenge to the jury instruction.

### A. Attempted Bank Robbery: Jury Instruction

Thornton contends that the district court erred in in-
structing the jury on the elements of attempted bank

robbery under § 2113(a) because the instruction did not require actual force and violence or intimidation. We review questions of statutory interpretation de novo, *United States v. Genendo Pharm., N.V.*, 485 F.3d 958, 962 (7th Cir.), *cert. denied*, 128 S. Ct. 670 (2007), and we review jury instructions for correct statements of the law de novo as well, *United States v. Cote*, 504 F.3d 682, 687 (7th Cir. 2007), *cert. denied*, 128 S. Ct. 2519 (2008). We will "reverse only if the instructions, viewed as a whole, misguide the jury to the litigant's prejudice." *Id.* (quotation omitted); *United States v. Palivos*, 486 F.3d 250, 257 (7th Cir. 2007) (indicating that when the jury instructions contain an error of law, we reverse if the instructions "viewed as a whole, misguide the jury to the litigant's prejudice" (citation omitted)).

The district court instructed the jury:

> To sustain the charge of attempted bank robbery, as alleged in Count 1 of the indictment, the government must prove the following propositions:
>
> First, that the defendant attempted to take from the person or presence of another money belonging to and in the care, custody, control, management, or possession of Bank One, 6532 West Cermak Road, Berwyn, Illinois;
>
> Second, that at the time charged in the indictment, Bank One, 6532 West Cermak Road, Berwyn, Illinois, had its deposits insured by the Federal Deposit Insurance Corporation; and
>
> Third, the defendant acted to attempt to take such money by force and violence or by intimidation.

In considering whether this instruction correctly states the law, we look to the statute itself, which states:

> Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another, or obtains or attempts to obtain by extortion any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, credit union, or any savings and loan association; or

> Whoever enters or attempts to enter any bank, credit union, or any savings and loan association, or any building used in whole or in part as a bank, credit union, or as a savings and loan association, with intent to commit in such bank, credit union, or in such savings and loan association, or building, or part thereof, so used, any felony affecting such bank, credit union, or such savings and loan association and in violation of any statute of the United States, or any larceny—

> Shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 2113(a). Thornton was charged under the first paragraph of § 2113(a). He contends that the statute's plain language requires a finding of actual force and violence or intimidation. He also asserts that the structure of § 2113(a) as a whole, legislative history, case law, and policy considerations all support the conclusion that actual force and violence or intimidation are required. We need go no further than the statutory language itself.

In analyzing the first paragraph of § 2113(a), we "begin by examining the text." *Carter v. United States*, 530 U.S. 255, 271 (2000). The relevant language for our purposes is: "Whoever, by force and violence, or by intimidation, takes, or attempts to take. . . ." 18 U.S.C. § 2113(a). Among the circuits that have directly addressed the issue, there is a split as to whether the statute requires proof of actual force and violence or intimidation. In *United States v. Bellew*, 369 F.3d 450, 453-56 (5th Cir. 2004), the Fifth Circuit held that the most natural reading of the text of the statute requires that a defendant actually commit an act of intimidation; attempted intimidation is insufficient under the first paragraph of § 2113(a). *See also United States v. Brown*, 412 F.2d 381, 384 n.4 (8th Cir. 1969) (approving of jury instruction on intimidation that required proof of one or more acts or statements done or made so as to produce in an ordinary person fear of bodily harm); *United States v. Baker*, 129 F. Supp. 684, 686 (S.D. Cal. 1955) ("It is apparent that in [the first paragraph of § 2113(a)] the 'attempt' relates to the *taking* and not to the intimidation"). In *Bellew*, the Fifth Circuit further considered § 2113(a)'s legislative history as interpreted by the Supreme Court in *Prince v. United States*, 352 U.S. 322 (1957), as support for its conclusion. *Bellew*, 369 F.3d at 455 ("It is a fair inference from the wording in the Act, uncontradicted by anything in the meager legislative history, that the unlawful entry provision was inserted [as the second paragraph of Section 2113(a)] to cover the situation where a person enters a bank for the purpose of committing a crime, but is frustrated for some reason before completing the crime." (alteration in original) (quoting *Prince*, 352 U.S. at 328)).

The Second, Fourth, Sixth, and Ninth Circuits, however, have concluded that an attempt to use force and violence or intimidate is sufficient under the statute, *United States v. Jackson*, 560 F.2d 112, 116-17 (2d Cir. 1977) (applying the logic of *United States v. Stallworth*, 543 F.2d 1038, 1040 (2d Cir. 1976), which addressed the "substantial step" element of attempt crime, to the first paragraph of § 2113(a)); *United States v. McFadden*, 739 F.2d 149, 152 (4th Cir. 1984) (following *Jackson*); *United States v. Wesley*, 417 F.3d 612, 618 (6th Cir. 2005); *United States v. Moore*, 921 F.2d 207, 209 (9th Cir. 1990), but they did so without analyzing the statutory text. These courts relied on the elements of an attempt crime—the specific intent to commit a crime and a substantial step towards the commission of that crime—instead. We do not find these cases persuasive because they omit an appropriate statutory analysis.

The Fifth Circuit's approach to interpreting § 2113(a) comports with the approach we have taken in analyzing 18 U.S.C. § 2114(a)—we examine the statutory text. In *United States v. Salgado*, 519 F.3d 411 (7th Cir. 2008), we considered the meaning of 18 U.S.C. § 2114(a), adhering to the plain language because it was clear and unambiguous.[1] *Salgado* points us in the right direction to answer the question before us: simply read the text. Under a straightforward reading of § 2113(a), the "attempt" language relates only

---

[1] At oral argument we requested supplemental briefing on the effect of *Salgado* which was decided after the briefing in this case.

to the taking and not to the intimidation. The government argues that all that is necessary is that a defendant attempt to intimidate while attempting to rob a bank. If that were so, attempt would relate to the "by force and violence or intimidation" language and the statute would have begun with, "Whoever attempts by force and violence or intimidation to take . . . ." The "by force and violence, or by intimidation" language relates to both "takes" and the phrase "attempts to take." Accordingly, actual force and violence or intimidation is required for a conviction under the first paragraph of § 2113(a), whether the defendant succeeds (takes) or fails (attempts to take) in his robbery attempt.

As the government did in *Salgado*, it again attempts to stretch federal law to cover an act that is not criminalized by the statute at issue. In both cases in its effort to do so, the government relied on the elements of an attempt crime and "a parade of horribles." *Salgado*, 519 F.3d at 413. Thornton could have been prosecuted under the second paragraph of § 2113(a)[2] so the government is not without a law under which to seek conviction of defendants under similar factual circumstances. The government notes that the second paragraph of § 2113(a) cannot serve as a predicate crime of violence to support a § 924(c)(3) charge. That is correct. But we cannot bend the statute simply

---

[2] In fact, he was initially charged with a violation of the second paragraph of § 2113(a) in the complaint when he was arrested. It appears that this suitable charge was abandoned in favor of the first paragraph count in the indictment so that the firearm count (with a mandatory consecutive penalty) could be added.

to accommodate the government's zeal to obtain stiffer penalties.

We begin and end with the statutory text, *see Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 475 (1992): the first paragraph of § 2113(a) requires actual intimidation for a conviction. The district court's instruction did not require the jury to find actual intimidation, thus omitting an essential element necessary for a conviction. This legal error prejudiced Thornton because it allowed the jury to convict him without finding actual intimidation beyond a reasonable doubt, and so we will reverse the conviction under § 2113(a). *See, e.g.*, *United States v. Perez*, 43 F.3d 1131, 1139-40 (7th Cir. 1994) (noting that the failure to correctly instruct on the elements of the offense usually results in reversal). The next section determines whether the reversal should be accompanied by a new trial or a judgment of acquittal.

## B.  Attempted Bank Robbery: Sufficiency of the Evidence

Thornton challenges the sufficiency of the evidence to convict him under § 2113(a), arguing that the government failed to prove actual intimidation. The government did not argue that Thornton used "force and violence," but instead rested its case on intimidation. When presented with a challenge to the sufficiency of the evidence, we will uphold the jury's determination if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United*

*States v. Seymour*, 519 F.3d 700, 714 (7th Cir. 2008) (internal quotation marks and citation omitted). Under this standard, we will not reverse "unless the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt*." Id.* And if the evidence is insufficient to support a guilty verdict, "we must reverse with instructions that the district court grant a judgment of acquittal*." United States v. Gee*, 226 F.3d 885, 892 (7th Cir. 2000).

"We have defined intimidation under § 2113(a) as 'saying or doing something in such a way as would place a reasonable person in fear.'" *United States v. Burnley*, No. 07-1314, --- F.3d ----, 2008 WL 2791670, at *2 (7th Cir. July 21, 2008) (quoting *United States v. Clark*, 227 F.3d 771, 775 (7th Cir. 2000)). Intimidation is the threat of force, *United States v. Hill*, 187 F.3d 698, 701 (7th Cir. 1999); *United States v. Smith*, 131 F.3d 685, 688 (7th Cir. 1997); *United States v. Jones*, 932 F.2d 624, 625 (7th Cir. 1991), which "'exists in situations where the defendant's conduct and words were calculated to create the impression that any resistance or defiance . . . would be met with force.'" *Burnley*, 2008 WL 2791670, at *2 (quoting *Clark*, 227 F.3d at 775) (internal quotation marks and citation omitted); *Smith*, 131 F.3d at 688. We apply an objective test: would the defendant's words or acts cause an ordinary person to reasonably feel threatened under the circumstances? *Clark*, 227 F.3d at 775; *Hill*, 187 F.3d at 702. We have said that "the context of the crime provides evidence of intimidation and . . . the defendant's appearance and actions during the course of the offense 'figure into the [intimidation] assessment.'" *Clark*, 227 F.3d at 775 (quoting *Hill*, 187 F.3d at 701).

Our cases illustrate what conduct amounts to intimidation. Most recently in *Burnley* we emphasized that "[c]redibly implying that a refusal to comply with a demand for money will be met with more forceful measures is enough" to prove intimidation. *Burnley*, 2008 WL 2791670, at *2. The *Burnley* defendants entered the banks, conveyed to the tellers their demands for the banks' money, and made it clear that they wanted no dye packs or bait bills. The tellers understood that the demands were not mere requests which could be ignored, but rather, felt compelled to comply. *Id.* at *1. We held that this evidence was sufficient to support the finding of intimidation. *Id.* at *2. Similarly, in *Clark* the defendant entered the bank, approached the teller and slid a note across the counter which instructed: "[R]emain calm and place all of your twenties, fifties, and hundred dollar bills on the counter and act normal for the next fifteen minutes." The teller was unsure what was happening and asked the defendant, "Huh?" to which he responded, "Yes, Ma'am, this is a holdup." 227 F.3d at 772-73. We held that the combination of the defendant's actions amounted to intimidation, indicating that it was reasonable for the teller to fear that the defendant "might use physical force to compel satisfaction of his demand for money." *Id.* at 775. Likewise, in *Hill* the defendant entered the bank, approached a teller and, while at arm's length from her, demanded, "Give me all your money" and added, "[D]on't give me any of the funny money." The teller complied, but not fast enough to suit the defendant, so he warned, "Hurry up, hurry up, bitch." 187 F.3d at 699-700. We held that the defendant's actions could be considered intimida-

tion even though he did not expressly threaten the bank teller, he did not carry a weapon, he spoke softly, and he was not an imposing figure. *Id.* at 701. And, similarly in *Jones*, the defendant walked up to the teller, announced, "This is a hold up," demanded money from the teller, and when the teller hesitated, he leapt onto the counter, opened the drawer, grabbed the money, and ran out of the bank. The defendant had a bag as did his accomplice, which the teller thought contained a weapon. The accomplice repeatedly warned the teller, "Don't touch nothing." 932 F.2d at 625. We found this ample evidence to support an inference that the defendant and his accomplice's behavior constituted the threat of force. *Id.* Each of these cases share two critical facts: the defendant entered the bank and made a demand for money. In contrast, Thornton never even made it into the bank or made a demand for money.

This case compares to those in which other circuits have held that the evidence was insufficient as a matter of law to support a jury finding of intimidation under § 2113(a). In *United States v. Wagstaff*, 865 F.2d 626 (4th Cir. 1989), for example, the evidence was that the defendant entered the bank, approached the tellers' counter, and put on a ski mask and sunglasses as he walked through an open gate into the teller area. He began taking money from an open cash drawer, getting $45 before a customer attacked him and he fled. Wagstaff never was within eight feet of the nearest teller, he was neither wearing nor carrying a weapon, and he never produced a note, said anything, or made any overtly threatening gestures. The nearest teller testified that she was afraid and that she

had been taught to assume that any person taking money from the bank was armed. *Id.* at 627. The Fourth Circuit acknowledged that being present during and witnessing a bank robbery "may well be a fear-inducing experience," *id.* at 629, but held as a matter of law that the evidence was insufficient to prove a taking by intimidation under § 2113(a), *id.* The court said that "the presumption that every robbery involves a weapon would seem to make the 'intimidation' requirement redundant." *Id.* It reasoned that to submit the question of intimidation to the jury in the absence of either an explicit threat of harm or an implicit threat of a weapon would:

> substitute[ ] a set of assumptions about the actions of a person taking money from a bank for the individualized analysis of that person's actual behavior called for by the § 2113(a) "intimidation" requirement. This in effect eliminates the statutory command that the government prove intimidation as a separate element of the crime of bank robbery.

*Id.*

Similarly, in *Bellew* the defendant entered the lobby of the bank, wearing what was described by a bank employee as an "obvious wig" and carrying a briefcase, which was later found to contain a firearm, instructions on how to rob the bank, and a demand note. Bellew asked to speak with the manager, was told the manager was busy and was asked to wait. Bellew initially waited a few minutes, but then left the bank, returning later to learn that the manager was still unavailable. 369 F.3d at 451. A bank employee reported Bellew's suspicious activity, and

the manager called the police, who confronted Bellew outside the bank. Bellew eventually admitted his intent to rob the bank. *Id.* at 452. Bellew made no explicit or implicit threats. And although he carried a gun in his briefcase, no one had seen it. The Fifth Circuit concluded that Bellew never used force and violence or intimidation as required under § 2113(a), thus reversing the conviction and remanding for a judgment of acquittal of the attempted robbery count. *Id.* at 454, 456.

*Burnley*, *Clark*, *Hill*, and *Jones* represent the more typical attempted bank robbery charged under the first paragraph of § 2113(a) in which the would-be bank robber enters the bank, interacts with bank personnel, and threatens a teller or other bank employee—or at the very least makes a demand for money, which may be viewed as an implicit threat of force. But here Thornton never even made it into the bank. He had no contact with any bank personnel and no one inside the bank even knew that a masked and disguised man was right outside the bank door. There was no evidence of either an explicit or implicit threat. Thornton made no demand for money. There was no evidence from which anyone at the bank—whether bank personnel, a bank customer like Contreras, or even a simple passerby—could reasonably infer that Thornton had a weapon or would use force. Thornton's mere presence at the bank's exterior door in an apparent disguise, carrying a duffle bag, and with his hand on the door does not even approach conduct suggestive of a demand for money or an implication that force would follow noncompliance with the as-yet unmade demand.

Contreras did testify that he inferred the masked man was up to no good and said that he was afraid because he thought the man had a gun and might shoot him. But even though Contreras's fear may be "probative of whether a reasonable person would have been afraid under the same circumstances," *Hill*, 187 F.3d at 702, it is not conclusive. We do not doubt that Contreras was afraid. Yet his fear that the man at the bank had a gun and might shoot him was not reasonably based on any words or actions of Thornton. Contreras's fear was based not only on what he observed and heard, but also, as in *Wagstaff*, on assumptions about what a would-be bank robber might do. Contreras had every right to infer that something was not right about the situation, but Thornton's words and actions did not give rise to a reasonable fear of the threat of force. The evidence allowed the jury to find that Thornton had a gun in his duffle bag, but Contreras never saw the gun and he had no reason to believe that Thornton had a gun. Thornton's action in reaching for something in his jacket pockets does not constitute a threatening gesture in itself and does not reasonably suggest that he carried a weapon. Under the circumstances presented, no reasonable person in Contreras's shoes would have felt threatened by acts or words of intimidation; the only words and actions that even begin to approach intimidating conduct occurred after Thornton already had abandoned his attempt to enter (and rob) the bank.

And if there could be any doubt as to whether the evidence measures up to intimidation, tellingly, the government has not contended—in its brief or at oral argument—that it proved actual intimidation. In response

to Thornton's challenge to the sufficiency of the evidence of actual intimidation, it argued only that it had proven a substantial step toward the commission of the crime and culpable intent.[3] The government also asserts that the evidence showed Thornton's "intent to use intimidation" and "intent to intimidate." But as we have decided, this does not suffice under a correct reading of the first paragraph of § 2113(a). And if that were not enough, the government clearly concedes in its brief that Thornton "never engaged in actual intimidation." (Appellee Br. 39.) The evidence at trial fits the second paragraph of § 2113(a) rather than the first; but Thornton was not charged under the second paragraph.

No reasonable jury could find beyond a reasonable doubt that Thornton said or did something that amounts to intimidation under § 2113(a). Thus, the government failed to prove an essential element of the crime of attempted bank robbery as charged in Count One. We accordingly reverse the conviction on Count One with instructions that the district court grant a judgment of acquittal.

### C. Firearm Charge

Thornton also contends that his conviction under the firearm charge in Count Two, 18 U.S.C. § 924(c)(1)(A),

---

[3] We do not quarrel with the government's view of the evidence as sufficient to prove substantial step and culpable intent, but that is not enough to support Thornton's conviction.

must be vacated. A conviction under § 924(c) must be predicated upon a crime of violence. 18 U.S.C. § 924(c)(1)(A)(I) ("[A]ny person who, during and in relation to any crime of violence . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall . . . [be sentenced to an additional term of imprisonment]."); *see also United States v. Jones*, 993 F.2d 58, 61-62 (5th Cir. 1993) ("Section 924(c)(1) requires the commission of a crime of violence in addition to the use of a firearm during the commission of that crime."). Because the firearm conviction turns on the attempted bank robbery charge, we must reverse the conviction on Count Two as well and remand for entry of a judgment of acquittal.

### III.  Conclusion

For the foregoing reasons, we REVERSE Thornton's convictions and VACATE his sentence with instructions to the district court to grant Thornton's motion for a judgment of acquittal as to both counts of the indictment.