McKEE,
Dissenting.
It is impossible for anyone -with an ounce of compassion to read through this transcript without becoming extraordinarily moved by allegations about what these children had' to endure. Had the defendants been convicted of assault, or crimes necessarily involving conduct that was in the same “ballpark” as assault as defined under New Jersey law, I would readily agree that this matter had to be remanded for resentencing using the federal guidelines that govern assault. However, the district court held a ten and a half hour sentencing hearing in an extraordinarily difficult attempt to sort through the emotion and unproven allegations and sentence defendants for their crimes rather than the conduct the government alleged at trial and assumes in its brief. I believe the court appropriately did so pursuant to 18 U.S.C. § 3553(a). Accordingly, I must respectfully dissent.
Before I begin my discussion, however, I must note that the defendants in this case were acquitted of the only federal offenses with which they were charged: assault with a dangerous weapon, with intent to do *404 bodily harm,[1] and assault resulting in serious bodily injury.[2] As I discuss more fully in Section II, these assault charges seem to drive the government’s argument and the Majority’s analysis. In order to minimize confusion about the precise nature of the charges in this case and the conduct that was proven, a chart listing each of the charges and their outcomes is attached as an addendum to this dissent.[3]
I. Sufficiently Analogous Offense Guideline Analysis
The defendants were charged with what can accurately be described as incredibly inhumane treatment approaching (if not actually amounting to) torture of the minor children whose care and well-being had been entrusted to them. Since the defendants lived on a federal military installation, they were subject to federal law pursuant to the Assimilated Crimes Act.[4]
“When an assimilated state offense resembles conduct for which a sentencing guideline for a federal offense has been promulgated, the Sentencing Guidelines provide that ‘the most analogous offense guideline’ should be applied.”[5] When it is thus necessary to select a “sufficiently analogous” offense guideline, I agree with the Majority’s adoption of an “elements-based” approach. The reasons for adopting that test are thoroughly explained in the Majority opinion.[6] However, for reasons I will explain, I do not agree with my colleagues’ application of that test on this record. I think the Majority’s application of that test confuses the two steps of the analysis. It also fails to appreciate several reasons that a sweeping statute like New Jersey’s endangering the welfare of a child (“EWC”) statute cannot be sufficiently analogous to the offenses corresponding to the federal assault guidelines under the circumstances here.
As we explained in United, States v. Cothran, “there is a two-stop process involved [in sentencing for a conviction without a corresponding federal guideline]: first, the district court must determine whether there is a sufficiently analogous [federal] guideline, and, if there is, it must determine which guideline is most analogous.”[7] These two steps are quite distinct. At step one, the court’s analysis is limited to a comparison of the elements of the state crime and any potentially analogous federal crimes. As the Court of Appeals for the Eighth Circuit has explained, “[Dieter-mining whether there is a sufficiently analogous guideline to a particular crime is generally a task of comparing the elements of federal offenses to the elements of the crimes of conviction.”[8]
*405 This step-one analysis may result in any one of three possible outcomes: (1) the court could determine that no guideline offenses are sufficiently analogous to the defendant’s conviction and apply the general sentencing provisions contained in 18 U.S.C. § 3553(a);[9] (2) the court could determine that only one guideline offense is sufficiently analogous to the crime of conviction and rely on that guideline to sentence the defendant;[10] or (3) the court could determine that there is more than one sufficiently analogous guideline to guide its sentencing inquiry. In that situation, the court must then move to step two to select the guideline that is “sufficiently analogous” to the offense of conviction to justify sentencing pursuant to that guideline.[11] Thus, the court only gets to step two if more than one federal crime has elements sufficiently analogous to the crime of conviction to justify fashioning a sentence that is guided by that federal crime. At step two, a court may expand its view of the state crime to include the actual conduct, to determine which of several potentially analogous crimes is the most analogous.[12] Indeed, it must do so in order to arrive at an appropriate sentence. Here, the district court did not find any sufficiently analogous guideline under step one (the first potential outcome described above), and therefore never moved to step two, where consideration of actual conduct would have been both necessary and appropriate.
Given the circumstances surrounding these convictions, the government’s argument addresses the inquiry at step one. The government claims that the state crimes of conviction — EWC and conspiracy to commit EWC[13] — are sufficiently analogous to offenses corresponding to the federal assault and aggravated assault guidelines to require application of those guidelines. As we have explained, when discussing whether a state crime[14] is anal *406 ogous to a federal guidelines offense, our sister circuit courts of appeals have compared the elements of the crime of conviction to the elements of one or more federal crimes.[15] Here, however, the government does not point to a single specific federal offense that has elements sufficiently analogous to New Jersey’s definition of EWC to justify using the federal assault guideline to determine these defendants’ sentences for conviction of that state offense. Instead, the government concludes that the federal assault and aggravated assault guidelines, which apply to 41 different sections in the Statutory Index,[16] generally cover the same crimes encompassed within the EWC statute. However, such blanket assertions are no substitute for the kind of side-by-side comparison of elements that the first step of the elements-based approach requires.[17] Moreover, as discussed below, an attempt to define the myriad types of conduct criminalized under the EWC statute as assault, and equate the two dissimilar offenses, overlooks the sweeping nature of the EWC statute and the imprecision that would result from the government’s approach.
New Jersey defines the crime of EWC in two statutes: N.J.S.A. §§ 2C:24-4a and 9:6-1. Section 2C:24-4a(2) defines the crime itself:
Any person having a legal duty for the care of a child or who has assumed responsibility for the care of a child who causes the child harm that would make the child an abused or neglected child as defined in R.S.9:6-1, R.S.9:6-3 and P.L. 1974, c. 119, § (C.9:6-8.21) is guilty of a crime of the second degree.[18]
Accordingly, here, the jury instructions required the jury to find the following elements beyond a reasonable doubt in order to find Carolyn and John guilty:
1. That [J.J.#2, J.J.#3, and C.J.#3] were children;
*407 2. That the defendant knowingly caused the child harm that would make the child neglected or knowingly committed an act of cruelty against the child;
3. That the defendant knew that such conduct would cause the child harm or would inflict cruelty upon the child; and
4. That the defendant had a legal duty for the care of the child or had assumed responsibility for the care of the child.[19]
For the second element, the jury was instructed that Section 9:6-1[20] of the New Jersey Statutes Annotated defines cruelty as consisting of any of the following acts performed by anyone having custody or control of the child:
(a) Inflicting unnecessarily severe corporal punishment upon a child;
(b) Inflicting upon a child unnecessary suffering or pain, either mental or physical;
(c) Habitually tormenting, vexing or afflicting a child;
(d) Any act of omission or commission whereby unnecessary pain and suffering, whether mental or physical, is caused or permitted to be inflicted on a child; or
(e) Exposing a child to unnecessary hardship, fatigue or mental or physical strains that may tend to injure the health or physical or moral well-being of such child.[21]
The jury instructions then defined neglect as “any of the following acts, by anyone having the custody or control of the child:”
(a) Failing to provide proper and sufficient food, clothing, maintenance ... medical attendance or surgical treatment ... or
(b) Failure to do or permit to be done any act necessary for the child’s physical well-being.[22]
In sum, to be guilty of second degree EWC under New Jersey law, a defendant must have knowingly harmed or neglected a child for whom he or she had a legal duty of care, in the man *408 ner set forth in the statutes. And the statute itself defines at least a dozen acts that would satisfy those elements.
In contrast, federal assault proscribes a much more limited and focused type of conduct. The federal crime of assault that the government seems to want the defendants to be sentenced for is defined as follows:
1) Simple assault of an individual under 16 years old;[23] or
2) Assault resulting in substantial bodily injury to an individual under 16 years old.[24]
The lesser of these crimes, the crime of simple assault, “is not defined anywhere in the federal criminal code,” but “has been held to ‘embrace the common law meaning of that term.’ ”[25] At common-law, simple assault is a crime “ ‘committed by either a willful attempt to inflict injury upon the person of another, or by a threat to inflict injury upon the person of another which, when coupled with an apparent present ability, causes a reasonable apprehension of immediate bodily harm.’ ”[26] For the second potentially analogous crime, assault resulting in substantial bodily injury, the statute defines “substantial bodily injury” as either “temporary but substantial disfigurement” or “temporary but substantial loss or impairment of the function of any bodily member, organ, or mental faculty.”[27] Though I agree with my colleagues’ conclusion that the EWC and federal assault offenses need not be a perfect match, there are nevertheless irreconcilable problems that prohibit the elements of the assault offenses from being viewed as sufficiently analogous to the elements of EWC for sentencing purposes under the ACA.
There are so many ways to violate New Jersey’s EWC statute that claiming the statute’s elements are sufficiently analogous to the elements of federal assault for ACA purposes oversimplifies the crime of EWC, and redefines it to such an extent that the resulting crime bears almost no resemblance to the crime defined by the New Jersey legislature or the policy behind it. Where, as here, the state criminalizes a wide variety of conduct, the inquiry must be whether any iteration of the state crime would necessarily constitute a violation of the federal offense. The district court correctly concluded that is just not the case here. I realize, of course, that “assaulting” one’s child could potentially (but, as discussed below, not necessarily) constitute a violation of the EWC statute, but that is only one of numerous ways New Jersey’s statute would be violated; the disconnect between such conduct and the elements of assault under federal law is just too great to consider one to be sufficiently analogous to the other’to control sentencing for EWC under New Jersey law.
The district court recognized that none of the federal assault offenses are aimed at many of the particular elements of EWC. *409 For example, the federal assault statute does not proscribe crimes of neglect, like the failure of a child’s caregiver to provide proper meals, schooling, medical attention, or clothing. Nor does it prohibit many of the acts of cruelty, such as “[h]abitually tormenting, vexing or afflicting a child” or “[ejxposing a child to unnecessary hardship, fatigue, or mental or physical strains,” that, are elements of EWC.[28] No definition of assault, no matter how expansive, includes such elements. Yet, such conduct would constitute a clear violation of New Jersey’s EWC statute. The Majority’s conclusion that EWC is sufficiently analogous to assault oversimplifies the former statute’s wide sweep while simultaneously ignoring and obfuscating its breadth. -
This incongruence is amplified and best illustrated by the fact that New Jersey actually permits some “assault” under the EWC statute. The statute criminalizes “inflicting unnecessarily severe corporal punishment upon a child.”[29] Thus, moderate corporal punishment would not constitute a violation of the statute. Indeed, severe corporal punishment would fall outside the reach of the EWC statute as long as it could also be deemed “necessarily severe.” And yet, such sanctioned corporal punishment would definitely satisfy the elements of federal assault. EWC is clearly focused upon the unique attributes of the parent/child relationship, and the district court clearly recognized that and struggled with that concept in determining whether there was a sufficiently analogous guideline offense for this state crime. The statute’s nuanced treatment of corporal punishment makes a finding that federal assault is sufficiently analogous to the EWC statute even more unsatisfactory.
Finally, even if the district court were to look at the actual conduct in this case— which it properly refrained from doing under step one of an elements-based approach — it would still be unable to conclude that every count of EWC in this case constituted assault. According to both the indictment and the jury verdict sheet, I agree that the jury found that the defendants endangered the welfare of their three adopted children by “assaulting [them] with various objects and with their hands,”[30] though I must note that the jury was given no guidance as to the definition of “assault.”[31] But none of the other EWC elements in this case would constitute assault. The defendants were convicted of withholding sufficient food and water, forcing the children to ingest hot sauce and red pepper flakes, and withholding prompt and proper medical care.[32] Though these descriptions are appalling, they simply do not constitute assault. I readily concede that the helplessness of these young children, the brutality that was alleged, and the extraordinarily unsympathetic nature of these “parents,” all combine to make it very tempting to simply conclude that these kids were assaulted and to conclude that the guideline for assault should have guided the court’s sentencing inquiry. However, although assault is one of many ways one can endanger the welfare of a child under New Jersey law, the defendants here were never convicted of assault (though that crime was included in the indictment), and the evidence of numerous other types of cruelty clearly satis *410 fy the elements of the crimes the defendants were convicted of.
For the foregoing’ reasons, I conclude that the crime of EWC is simply not sufficiently analogous to the crimes corresponding to the federal assault guidelines, and the gruesome nature of the charges does not alter that fact.
II. Other Concerns
Though my main concern in writing separately is to express my agreement with the district court’s conclusion that there is no sufficiently analogous guideline to apply in this case, I would be remiss if I did not also mention other concerns: first, the role that acquitted conduct plays here; second, the appropriateness of the district court’s refusal to find facts after determining that there was no sufficiently analogous guideline in this case; and finally, the irony of the government’s opposition to allowing the jury to characterize the degree of the victims’ harm.[33]
A. Acquitted Conduct & Unproven Harm
There is an unspoken argument here that, even though defendants were acquitted of federal assault, the court could consider the allegations of assault in imposing a sentence under the doctrine of acquitted conduct, and that evidence should have been considered by the district court when determining whether the assault guideline was sufficiently analogous.[34] Not only would the examination of particular conduct in step one of the sufficiently analogous analysis have been improper, given the conduct the defendants were acquitted of, the district court correctly concluded that attempts to retroactively shoehorn their conduct into the assault guideline is akin to “fitting a square peg into a round hole.”[35]
As established in United States v. Watts — a decision that included review of two cases: Watts and Putra — a sentencing court may consider conduct a defendant has been acquitted of, so long as that conduct has been proven by a preponderance of the evidence.[36] In Watts, police discovered cocaine base and two loaded guns in Watts’s house. A jury convicted Watts of possession with intent to distribute,[37] but acquitted him of using a firearm in relation to a drug offense.[38] During sentencing, the district court found by a preponderance of the evidence that Watts had possessed the guns in connection with the drug offense and accordingly applied a guideline for that conduct that added two points to his base offense level.[39] In Putra, *411 authorities had videotaped two instances of Putra and her codefendant selling cocaine to a government informant. The jury convicted Putra of aiding and abetting with intent to distribute one ounce of cocaine on May 8, 1992, but acquitted her on a second count of the same crime on May 9, 1992. At sentencing, the district court found by a preponderance of the evidence that Putra had been involved in the May 9th transaction and calculated her base offense level by aggregating the amounts of both sales.[40] The Supreme Court later upheld these sentencing decisions.[41]
Here, as my colleagues explain, the crimes alleged in the fifteen-count superseding indictment that was filed against the defendants “can be organized into three different categories: an assimilated state conspiracy charge [for which they were both convicted], assimilated state substantive offenses [of endangering the welfare of a child, for which John was convicted of ten counts and Carolyn of twelve counts], and substantive charges under federal law.”[42] The third category includes only one kind of charge: assault as defined under federal law in 18 U.S.C. § 113(a)(3) (prohibiting assault with a dangerous weapon, with intent to do bodily harm) and § 113(a)(6) (assault resulting in serious bodily injury). As noted at the outset, the assault charges were dismissed when the district court granted judgments of acquittal on Counts 13-14 at the close of the government’s case.[43]
Accordingly, the only conduct that was submitted to the jury for proof beyond a reasonable doubt was the conduct alleged in counts charging endangering the welfare of a child under New Jersey law, N.J.S.A. §§ 2C:24-4A and 9:6-1, and Count 1, charging conspiracy to do so. Importantly, the jury was neither instructed on, nor required to find, the elements of any kind of assault. Moreover, both defendants were affirmatively acquitted of assault resulting in substantial bodily injury, one of the offenses the government points to as sufficiently analogous to the EWC convictions.
It goes without saying that “[o]nly if a jury of an individual’s peers concludes beyond a reasonable doubt that he or she committed each element of the charged offense, as defined by the legislature, may the court impose punishment.”[44] Therefore, jury instructions must contain all the essential elements of the crimes charged.[45] And yet, despite the absence of any pertinent jury instructions, and despite the acquittals on federal assault offenses, the *412 government now asks us to force the district court to sentence these defendants as if the jury had found them guilty of assault. The district court quite correctly resisted that invitation, and so should we.
Unlike the issue in Watts regarding the calculation of the proper base offense level, the district court’s task in sentencing under the ACA occurs much earlier in the sentencing process. The real question a sentencing judge is attempting to answer at step one of the sufficiently analogous guideline analysis is, “Which federal crime — if any — has analogous elements to the state crime of conviction?” In the cases consolidated in Watts, there was no question as to which guideline to use, as the defendants were convicted of federal crimes that had already been assigned specific guidelines. In this case, however, the defendants were convicted of state crimes that did not have a corresponding federal guideline. Thus, as discussed above, the court had to determine if the elements of New Jersey’s EWC statute were so similar to the elements of the federal assault statute that, for sentencing purposes, a violation of one could fairly guide sentencing a violation of the other. For all the reasons explained in Section I, the district court was correct in concluding that sentencing discretion under one should not be guided by guidelines established for elements of the largely dissimilar other.
B. Fact-Finding
Because there was no sufficiently analogous guideline in this case, the district court was not required to conduct the kind of fact-finding necessary to determine the applicability of guideline adjustments. I agree that this second claim of error is “moot if this Court finds that the [district court] correctly determined that there was no sufficiently analogous guideline,”[46] which I believe it did. Both the government’s argument and the Majority’s conclusion regarding the necessity of fact-finding here disregards the fact that this case was not a guidelines case, and that the district court “properly followed § 2X5.1’s explicit instructions by sentencing according to § 3553.”[47]
I also take issue with the government’s cited support for its argument that the district court erred in refusing to find facts. The government notes that the district court disregarded “all the [Pre-Sen-tence Report] paragraphs discussing the offenses.”[48] But the district court had sound reason for doing that, which the government fails to mention. The government conceded that the statement of facts section of the PSR was drafted by the prosecution.[49] The district court found it was “a description of the offense conduct taken from the government’s narrative without any investigation by presentence,” and it “wasn’t helpful”- because “[i]t was *413 argument.”[50] The court’s actions were appropriate given its conclusion that there was “a real problem with saying that this is what was proven without judicial fact-finding nailing it down because that’s not what a jury found.”[51] The court had every right to refuse to rely on a document that it believed was more the result of the government’s advocacy than an objective effort to assist the court at sentencing. It is clear from the sentencing hearing that the district court was not convinced by a preponderance of the evidence of all of the conduct that the government had alleged and relied on for sentencing purposes. Thus, after discovering that “Probation did no independent investigation at all regarding those facts,” the district court was correct to ignore the PSR’s statement of facts and base a sentence on the elements of the offenses that were proven at trial.[52]
C. A Final Irony
Before concluding, I think it is important to emphasize something about the government’s argument here. It is a position that is ironic at best, and disingenuous at worst. During the trial, the defense asked the court to have the jury return a verdict with interrogatories that would have shown the specific harm the jury was convinced had been proven.[53] In the end, the government successfully opposed the defendants’ request that the jury make specific findings as to the degree of harm allegedly caused by the defendants.[54] The government later explained that “certain things, such as degree of harm or danger are historically elements of assault, they are not elements of the crimes for which these defendants were convicted.”[55] Yet, the government now complains because the court refused to sentence the defendants for assault. Moreover, the government’s objection prevented any additional fact-finding by the jury that would have established the harm that was actually proven. Whether the government was motivated by a concern about having to prove conduct that was not an element of the crimes charged, or whether the objection *414 was a tactic to allow it to later have the court sentence the defendant for conduct without bearing the burden of proving it beyond a reasonable doubt, it cannot be disputed that the objection created the possibility that the district court may not have been sufficiently convinced of the degree of harm caused by defendants to analogize the elements of EWC under New Jersey law to the elements of the federal assault statute. That, in fact, is what happened.
On appeal, it is no less difficult to determine the precise harm that was proven. As the Majority notes, “[g]iven the expansive nature of the child endangerment instructions as well as the allegations against [defendants (involving numerous acts of abuse committed over the course of a five-year conspiracy), we recognize the difficulty in connecting each count with a specific incident or a particular injury or condition.”[56] This difficulty is due, in part, to an unresolved dispute regarding the causation of the children’s injuries and medical conditions.[57] Additionally, the government again contributes to the difficulty by repeatedly citing in its brief the very sections of the PSR that the court refused to rely on during sentencing.[58] As the defendants point out, the brief reiterates much of the harm that defendants allegedly caused, but we are left with no way of knowing what was actually proven; especially since the counts charging assault were dismissed and never even submitted to the jury.
One of the more egregious examples of the government’s exaggeration of the harm found by the jury is its treatment of Joshua’s death. At trial, the court excluded all references to Joshua’s death — a fact that is not noted in the Majority opinion— as the government did not charge the defendants with causing his death. In fact, the first trial in this case ended in a mistrial, when the government “inadvertently asked a question suggesting Joshua was no longer alive.”[59] During sentencing here, the district court admonished the government for arguing that the court should consider Joshua’s death when calculating the sentence:
I do not believe that the government has a right to ask me to sentence as if the parents contributed to- the death of Joshua.... [T]he government walked away from proving a death case and couldn’t get an expert to opine that they caused his death and rather backdoor that into this case.[60]
And yet, the government now argues on .appeal that the defendants “contributed to [Joshua’s] death.”[61] Indeed, even the Majority concedes that “[t]he government admittedly does read too much into the jury’s verdict.”[62] The government’s continued refusal to accept the limitations of the jury’s findings is one of the main reasons sentencing was so challenging in this case. The district court very carefully sorted through all of this in a ten-and-a-half-hour sentencing hearing. Given the complexities and ambiguities of this case, I cannot conclude the court erred or abused its discretion. To the contrary, the court recognized the disconnect between the endangering the welfare of a child statute that the defendants were convicted of and the *415 counts charging federal assault that were all dismissed. The court then tried to fashion a sentence that was consistent with the principles set forth in 18 U.S.C. § 3553(a), the general federal sentencing statute. I certainly do not agree with everything the court said during that ten-and-a-half-hour inquiry, but I do not think the court erred or abused its discretion in fashioning these sentences.
Indeed, the district court did the best it could in this situation. The government charged the defendants with federal assault; the district court granted judgments of acquittal on the two federal assault charges. The district court’s rationale for granting acquittal on the assault charges parallels the reasoning that an elements-based approach does not permit a finding that the federal assault guideline is sufficiently analogous to the crime of EWC. The court explained:
I find that the activity is not of an ilk to constitute ... an assault as that activity or conduct as contemplated in the statute. I find that the combination of events, withholding or activities withholding water, administering hot sauce, watching [the child] decline and not doing anything about it does not constitute battery, or would put a victim in the apprehension of immediate bodily harm.[63]
Despite the district court’s ruling, the government requests that we now require the district court to resentence defendants according to guidelines intended to guide sentences imposed for the very offense defendants were acquitted of. I am unwilling to do so.[64]
As I conceded at the outset, this is a horrendous case in which the most innocent among us had to endure atrocious neglect and cruelty. As Justice Holmes stated over 100 years ago, “hard cases ... make bad law.”[65] Because of the ambiguities in the jury’s verdict and the breadth of harm included in the state offense the defendants were convicted of, this case is as hard as it is tragic. But I cannot agree with my colleagues’ conclusion that the district court erred in imposing these sentences. Accordingly,
I must respectfully dissent from the opinion of my colleagues.
APPENDIX
Charges Against Carolyn & John Jackson
*416 Count Charged Crime Superseding Indictment Description[66] ¡ Carolyn’s Outcome John’s Outcome
1 Conspiracy to Endanger the Welfare of a Child N.J.S.A. § 2C:5-2 Guilty Guilt}’
2 Endangering the Welfare of a Child •N.J.S.A. § 2C:24-4a “ [Withholding sufficient nourishment and food from J.J.#2” Guilty Not Guilty
3 Endangering the Welfare of a Child N.J.S.A. § 2C:24-4a “[PJhysieally assaulting J.J.#2 with various objects and with their hands'” Guilty Guilty
4 Endangering the Welfare of a Child N.J.S.A. § 2C:24-4a “[Withholding adequate water . , . and prohibiting J.JJ3 from drinking water” Guilty Guilty
5 Endangering the Welfare of a Child N.J.S.A. § 2C:24-4a “IF’lorcing J.J.#3 to ingest hot sauce, red pepper flakes, and raw onion” Guilty Guilty
6 Endangering the Welfare of a Child N.J.S.A. § 2C:24-4a “[Pjhysically assaulting J.JJ3 with various objects and with (heir hands” Guilty Guilty
7 Endangering the Welfare of a Child N.J.S.A. § 2C:24-4a “[Withholding sufficient nourishment and food from C.J.tí3” Guilty Guilty
8 Endangering the Welfare of a Child N.J.S.A. § 2C:24-4a “[Withholding adequate water . . . and prohibiting C.J,#3 from drinking water” Guilty Guilty
9 Endangering the Welfare of a Child N.J.S.A. § 2C:24-4a “[Fjorcing C.JJ3 to ingest hot sauce and red pepper flakes” Guilty Guilt}’
10 Endangering the Welfare of a Child N.J.S.A. § 2C;24-4a “[Cjausing C.J.#3 to ingest excessive sodium and a sodium-laden substance while restricting [her] fluid intake, causing [her] to suffer hypernatremia and dehydration, a life-threatening condition” Guilty Not Guilty
11 Endangering the Welfare of a Child N..I.S.A. ij 2C:24-4a “[Withholding prompt and proper medical care for C.J.#3’s dehydration and elevated sodium levels” Guilt}’ Guilt}’
12 Endangering the Welfare of a Child N.J.S.A. § 2C:24-4a “[P]hysically assaulting C..T.S3 with various objects and with their hands” Guilty Guilty
15[67] Endangering the Welfare of a Child N.J.S.A. § 2C:24-4a “[Withholding prompt and proper medical care for C.J.#3’s fractured humerus” Not Guilty Not Guilty
13 Assault 18U.S.C. § 113(a)(3) “[W]ith intent to do bodily harm assaulted C.JJ3 with a dangerous weapon” Judgement of Acquittal Judgment of Acquittal
14 Assault 18U.S.C. § 113(a)(6) “[[Intentionally assaulted C.J.#3. resulting in serious bodily injury” Judgement of Acquittal Judgement of Acquittal

. 18 U.S.C. § 113(a)(3).

. Id. at § 113(a)(6). Both federal assault charges were dismissed when the district court granted judgments of acquittal at the close of the government’s case.

. See Appendix, Table of Charges Against Carolyn & John Jackson.

. 18 U.S.C. § 13(a). Given the Majority’s thorough discussion of the ACA, I need not reiterate its text or its historical development. See Maj. Op. at 370.

. United States v. Finley, 531 F.3d 288, 292 (4th Cir. 2008) (quoting U.S.S.G. § 2X5.1).

. Maj. Op. at 374-75.

. 286 F.3d 173, 177 (3d Cir. 2011) (explaining and then adopting the Eighth Circuit’s approach in United States v. Osborne, 164 F.3d 434 (8th Cir. 1999)).

. United States v. Allard, 164 F.3d 1146, 1149 (8th Cir. 1999); see also United States v. Nichols, 169 F.3d 1255, 1270 (10th Cir. 1999) ("Whether there is a sufficiently analogous guideline to a particular crime is generally a task of comparing the elements of the defendant’s crime of conviction to the elements of federal offenses already covered by a specific guideline. The determination on this point is a purely legal one, and the district court need *405 not consider the underlying factual circumstances of the defendant’s case.” (citation omitted)).

. See, e.g., Finley, 531 F.3d at 289-90 (finding no sufficiently analogous federal guideline for " 'knowingly driving or operating a motor vehicle while under the influence of alcohol, third offense within ten years’ ” and " 'driving a motor vehicle on a highway while [his] operator’s license was suspended and/or revoked,' ” in violation of Virginia law); United States v. Reyes, 48 F.3d 435, 437-38 (9th Cir. 1995) (finding no sufficiently analogous federal guideline for the state offense of driving without a license).

. See, e.g., United States v. Calbat, 266 F.3d 358, 362-63 (5th Cir. 2001) (applying "aggravated assault” guideline to an Assimilative Crimes Act conviction for “intoxication assault”); United States v. Queensborough, 227 F.3d 149, 152 n.2 (3d Cir. 2000) (applying "criminal sexual abuse” guideline to an Assimilative Crimes Act conviction for "aggravated rape”).

. See, e.g., United States v. Terry, 86 F.3d 353, 357-58 (4th Cir. 1996) (comparing "aggravated assault” guideline and "property damage or destruction” guideline to an Assi-milative Crimes Act conviction for “shooting at an occupied vehicle”).

. Osborne, 164 F.3d at 439 ("In determining the most analogous guideline under USSG § 2X5.1, a district court is to look not merely to the definition of the offenses, but also to the actual conduct of the individual defendant.”).

. As discussed more thoroughly in Section II.A, though the defendants were charged with two counts of federal assault, the district court granted judgments of acquittal on those two counts, and they were never submitted to the jury.

. It is important to note that many cases dealing with U.S.S.G. § 2X5.1’s "most analogous offense guideline” provision deal not with state crimes that have been assimilated into federal law under the ACA, but with sentencing for federal crimes without any corresponding guideline. See, e.g., Cothran, 286 F.3d at 176-78 (affirming district court's con- *406 elusion that conveying false information and threats about carrying an explosive device on an airplane under 49 U.S.C. § 46507 was most analogous to crimes corresponding to U.S.S.G. § 2A6.1, which is applicable to "Threatening or Harassing Communications”); United States v. McEnry, 659 F.3d 893, 897 (9th Cir. 2011) (finding that district court erred in holding federal crime of " 'knowingly and willfully serv[ing] ... as an airman without an airman’s certificate authorizing the individual to serve in that capacity’ ” under 49 U.S.C. § 46306(b)(7) was most analogous to crimes corresponding to U.S.S.G. § 2A5.2, which applies to "Interference with Flight Crew Member of Flight Attendant; Interference with Dispatch, Navigation, Operation, or Maintenance of Mass Transportation Vehicle”); United States v. Rakes, 510 F.3d 1280, 1287-90 (10th Cir. 2007) (affirming district court’s conclusion that conspiracy to impede or injure an officer under 18 U.S.C. § 372 was most analogous to crimes corresponding to U.S.S.G. § 2A6.1(a)(1), which covers certain crimes involving threatening or harassing communications); Nichols, 169 F.3d at 1269-76 (affirming district court’s conclusion that conspiring to use weapon of mass destruction under 18 U.S.C. § 2332a was most analogous to first-degree murder and U.S.S.G. § 2A1.1). Because these cases are not quite the same as cases wherein a state statute is assimilated into federal law, I have focused my analysis on the latter.

. See, e.g., Calbat, 266 F.3d at 363 (comparing intoxication assault under Texas law to the federal offense of aggravated assault involving serious bodily injury); Osborne, 164 F.3d at 438-39 (comparing vehicular battery under South Dakota law to the federal offense of assault resulting in serious bodily injury); Allard, 164 F.3d at 1149 (comparing vehicular battery under South Dakota law to the federal offense of involuntary manslaughter).

. The Statutory Index specifies which sentencing guideline matches the federal statute of conviction.

. See Calbat, 266 F.3d at 363; Allard, 164 F.3d at 1149; Osborne, 164 F.3d 434 at 437.

. N.J.S.A. § 2C:24-4(a)(2).

. A6009.

. The jury instructions are almost word-for-word recitations of the statutory definitions of cruelty and neglect, as defined in N.J.S.A. § 9:6-1:
Cruelty to a child shall consist in any of the following acts: (a) inflicting unnecessarily severe corporal punishment upon a child; (b) inflicting upon a child unnecessary suffering or pain, either mental or physical; (c) habitually tormenting, vexing or afflicting a child; (d) any willful act of omission or commission whereby unnecessary pain and suffering, whether mental or physical, is caused or permitted to be inflicted on a child; (e) or exposing a child to unnecessary hardship, fatigue or mental or physical strains that may tend to injure the health or physical or moral well-being of such child. Neglect of a child shall consist in any of the following acts, by anyone having the custody or control of the child: (a) willfully failing to provide proper and sufficient food, clothing, maintenance, regular school education as required by law, medical attendance or surgical treatment, and a clean and proper home, or (b) failure to do or permit to be done any act necessary for the child’s physical or moral well-being. Neglect also means the continued inappropriate placement of a child in an institution, as defined in section 1 of P.L.1974, c. 119 (C. 9:6-8.21), with the knowledge that the placement has resulted and may continue to result in harm to the child’s mental or physical well-being.

. A6010. There is a line drawn through the words “or moral” in Section (e) of the jury instructions, the word "moral” is circled, and there is a check mark in the margin. It is unclear whether these words were therefore omitted from the jury instructions.

. Mat 6011.

. 18 U.S.C. § 113(a)(5).

. 18 U.S.C. § 113(a)(7). Defendants were acquitted of the related charge of 18 U.S.C. § 113(a)(6), which prohibits ‘‘[a]ssault resulting in serious bodily injury" without the requirement that the victim be under 16 years of age.

. United States v. Chestaro, 197 F.3d 600, 605 (2d Cir. 1999) (quoting United States v. Stewart, 568 F.2d 501, 504 (6th Cir. 1978)); see also United States v. Estrada-Fernandez, 150 F.3d 491, 494 n.1 (5th Cir. 1998); United States v. Juvenile Male, 930 F.2d 727, 728 (9th Cir. 1991).

. United States v. McCulligan, 256 F.3d 97, 103 (2001) (quoting Chestaro, 197 F.3d at 605).

. 18 U.S.C. § 113(b)(1)(A)-(B).

. N.J.S.A. § 9:6-1.

. Id. (emphasis added).

. A34-53, 6054-61.

. See Section II.A for a further discussion of the jury instructions in this case.

. See Appendix, Table of Charges Against Carolyn & John Jackson.

. Because, as the Majority explains, ‘‘[o]ur preferred course of action upon finding procedural error is to remand the case for resen-tencing, without considering the substantive reasonableness of the sentence imposed,” I refrain from reaching the substantive unreasonableness of the sentence here, where the Majority’s finding of procedural error alone provides basis for remanding. Maj. Op. at 319.

. Almost as an aside the government suggests that the district court should have sanctioned the defendants for conduct they were not convicted of under the doctrine of acquitted conduct. See Gov’t Br. at 44-5 ("Indeed, courts may even include facts that might have formed the basis for acquitted counts, as well as entirely separate uncharged offenses.” (citing United States v. Watts, 519 U.S. 148, 149, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997) (per curiam); United States v. Grier, 475 F.3d 556, 565-68 (3d Cir. 2007) (en banc))).

. A6588.

. 519 U.S. 148, 157, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997); see also U.S. v. Grier, 475 F.3d 556, 561 (3d Cir. 2011).

. 21 U.S.C. § 841(a)(1).

. 18 U.S.C. § 924(c).

. 519 U.S. at 150, 117 S.Ct. 633.

. Id. at 150-51, 117 S.Ct. 633.

. Id. at 157, 117 S.Ct. 633 (reversing circuit court judgments and remanding for further proceedings consistent with the opinion).

. Maj. Op. at 368.

. The defendants were also acquitted of additional counts of child endangerment — John was acquitted of Counts 2, 10 and renumbered 13, while Carolyn Jackson was also acquitted of renumbered Count 13. After the district court entered a judgment of acquittal on Counts 13 and 14 at the close of the government’s case, the original Count 15 was renumbered Count 13 on the verdict sheet.

. Grier, 475 F.3d at 562 (citing U.S. v. Booker, 543 U.S. 220, 230, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005))

. See, e.g., Chambers v. McDaniel, 549 F.3d 1191, 1201 (9th Cir. 2008) (holding defendant's federal constitutional due process right was violated because jury instructions permitted jury to convict him of first-degree murder without finding separately all three elements of the crime: willfulness, deliberation, and premeditation); United States v. Thornton, 539 F.3d 741, 748-51 (7th Cir. 2008) (reversing convictions for attempted bank robbery and possessing a firearm in furtherance of a crime of violence because jury instruction on the bank-robbery charge failed to include essential element of actual intimidation).

. John Br. at 30.

. Id. at 32 (citing A6589 (excerpt from sentencing transcript where district court explains decision to sentence according to § 3553 and states this was "not some kind of United States versus Koon [situation] where I'm saying this is just so unfair, I’m going to make up this mechanism and then we'll make it stick.... This is in the guidelines. The guidelines in 2X5.1 anticipated there would be a time, under the ACA or some other assimilative statute where we might have to do this.”)). See Koon v. United States, 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996).

. Gov't Br. at 43 n. 19.

. A6072 (prosecution admitting to writing statement of facts during motion hearing), A6740 (same during sentencing hearing). Though the government stated that its composition of the PSR’s statement of facts is "what is done in almost every PSR in this District,” the district court disagreed. A6740-41.

. A6738-39.

. A6739.

. A6740.

. A5468-70. This discussion included reference to NJ.S.A. § 9:6-8.21(c), which defines "abused or neglected child,” in relevant part, as:
[A] child less than 18 years of age whose parent or guardian, as herein defined, (1) inflicts or allows to be inflicted upon such child physical injury by other than accidental means which causes or creates a substantial risk of death, or serious or protracted disfigurement, or protracted impairment of physical or emotional health or protracted loss or impairment of the function of any bodily organ; (2) creates or allows to be created a substantial or ongoing risk of physical injury to such child by other than accidental means which would be likely to cause death or serious or protracted disfigurement, or protracted loss or impairment of the function of any bodily organ;.... (4) or a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian, as herein defined, to exercise a minimum degree of care (a) in supplying the child with adequate food, clothing, shelter, education, medical or surgical care though financially able to do so or though offered financial or other reasonable means to do so, or (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court....

. See A5457-72 (government’s argument), A5477-78, 5485-88 (court rejecting defendants’ request).

. A6460.

. Maj. Op. at 392.

. See Maj. Op. at 392 (acknowledging that "the parties ... contest causation”).

. Gov't Br. at 6-8, 72 n.34.

. Gov’t Br. at 17 n.8.

. A6695.

. Gov't Br. at 45; see also id. at 54, 75.

. Maj. Op. at 392.

. A5444.

. The district court explained its similar finding "that trying to push findings that would comfortably make the conduct aggravated assault and going from there under the guidelines offends fairness to allow the government to charge one thing and a lower standard of proof to prove something much harsher and come away with a sentence much greater than the jury verdict necessarily leads to with the Judge leading the charge saying oh, yes, it does, because I’m making these findings.” A6588.

. Northern Sec. Co. v. United States, 193 U.S. 197, 364, 24 S.Ct. 436, 48 L.Ed. 679 (1904) (Holmes, J., dissenting).

. A34-52.

. After the district court entered a judgment of acquittal on Counts 13 and 14, the original Count 15 was renumbered Count 13 on the verdict sheet.